408 S.E.2d 724 (1991)
330 N.C. 724
STATE of North Carolina
v.
Jackie Robert ANGEL.
No. 505A90.
Supreme Court of North Carolina.
October 3, 1991.
Lacy H. Thornburg, Atty. Gen. by Debra C. Graves, Asst. Atty. Gen., Raleigh, for the State.
Malcolm Ray Hunter, Jr., Appellate Defender by Teresa A. McHugh, Asst. Appellate Defender, Raleigh, for defendant appellant.
WHICHARD, Justice.
In a noncapital trial, defendant was convicted of the murder of his wife, Betsy Angel. Pursuant to N.C.G.S. § 7A-27(a) (1989), defendant appeals as a matter of right his conviction of first-degree murder and sentence of life imprisonment. Defendant assigns as error the introduction into evidence of a number of allegedly hearsay statements. Assuming error arguendo in the admission of the statements, we conclude that the error was harmless.
The State's evidence tended to show that in February 1989, defendant sought treatment at Appalachian Hall, a substance abuse center. Defendant left Appalachian Hall in late February, two or three weeks before he killed Betsy Angel on Friday, 10 March 1989. At the time of the killing, defendant and the victim had been separated for six or seven months.
Steve Angel, defendant's brother, testified that he saw defendant at about 7:15 on the morning of the shooting. Steve Angel was driving to work when he passed defendant; defendant hit his brakes, turned around, and caught up with his brother. The two men pulled off the road and began talking. Steve Angel testified that defendant said "[h]e was going to go to Alaska, but he had some things he had to do before he went to Alaska.... He said that he had to kill Betsy before he went to Alaska.... and then he said, I might kill myself." Steve Angel testified that he tried to talk defendant into riding around with him for a while, but defendant just turned around, got back in his truck, and left. Defendant followed Steve Angel down the road briefly, *725 but then turned his car around and drove back towards the Mashburn Branch Community where Betsy Angel lived. Steve Angel drove to work and informed the police of defendant's intentions; he then drove to his father's house where he called to warn Betsy.
At about 7:55 that morning Thelma Angel, defendant's sister-in-law and Betsy Angel's neighbor, phoned Betsy to warn her that she had seen defendant's truck in the yard. Thelma Angel testified that she watched as defendant got out of his truck, reached down to pick up something inside the cab, pulled down the tail of his coat, and walked to the deck at the rear of Betsy's house. Thereafter, Thelma's attempts to call Betsy's house resulted in a busy signal.
Travis Angel, the fifteen-year-old son of defendant and Betsy Angel, was at home with his mother the morning of 10 March 1989. Travis testified that he was dressing for school as he saw his father drive up to the house. He heard his father step onto the deck and begin talking to his mother. He described the scene as follows:
[Betsy said p]eople who love people don't do this.... And they talked around for a little while, and [defendant] said, let me in. She goes, I don't think you need in. And he goes, let me in, and there was this pushing around, and then I heard her yell, Travis.... And so I just ran in there, and when I got to the steps, I heard a gun go off. And Mama came around the corner, and she was holding her side and said, he shot me. And Daddy came around the corner and he was holding a gun, and hehis eyes and stuffyou know, they were just like a glazed over look.
While defendant followed Betsy into the bedroom, Travis ran to the bathroom; then he ran upstairs to get his shotgun. Travis came back downstairs and met defendant at the foot of the stairs. Travis asked defendant to give up the gun, and defendant said, "[s]hoot me Travis, I'm crazy." Travis again asked for the gun, and defendant said he was leaving. Defendant then left, and Travis called for an ambulance and began administering cardiopulmonary resuscitation to his mother.
Dr. Michael B. Rohlfing, a forensic pathologist, testified that Betsy Angel died from loss of blood. His autopsy revealed that a single bullet entered the left back and exited above the left breast. The bullet penetrated the left lung and the upper vessel of the heart.
Defendant was arrested soon after the shooting. Police found a .38 caliber Smith and Wesson, snub-nosed, nickel-plated revolver in the cab of defendant's truck. The parties stipulated that the gun found in defendant's truck contained one spent cartridge and five live ones; they further stipulated that a bullet found in the wall of Betsy Angel's house matched the revolver found in defendant's possession.
The State introduced several statements made by defendant following his arrest. State Bureau of Investigation Agent Moody testified that defendant signed a written waiver of his rights and agreed to answer questions. According to Moody, "[defendant] could not deny that he had shot his wife and to quote his words, he said `all I can say, is I done it'" Defendant said that he and Betsy had been separated for about six months and "that he could not stand her running around with other men." Defendant said he woke up early on 10 March 1989, and then he drove to Richard Laughlin's house to get a .38 revolver that Laughlin kept in his truck. Defendant then drove around until he met his brother, Steve Angel; the two brothers talked for a while by the side of the road. Moody further described defendant's statement as follows:
[A]fter leaving Steve, he went to Betsy's house.
... He said that he parked the truck and went up on to the porch and knocked at the sliding glass door. He said that after knocking at the door, Betsy came to the door and opened it. He said that he accused her of running around, and she told him that she'd do what she wanted to do. He said that after she told him that, that he drew the pistol from the waist band of his pants; that he *726 had been carrying it in the back. And that when she saw the gun, she turned to run. He said as she turned to run from him, he shot her in the back.
... He said that he just couldn't let her run away from him.
Moody testified:
I asked him if the shooting was an accident. He said that it was not. He went on to say that he was not proud of what he had done, and I quoted him as saying, "that it would take a sorry man to do something like that."
....
I asked him if he intended to kill her. He said that he did not have any intentions to kill her, and after pausing, added, "but maybe I did, I shouldn't have gotten that gun."
Several witnesses testified on defendant's behalf to the effect that defendant may have been insane at the time of the shooting. Joe Doster, a member of the Macon County Emergency Medical Service, testified that he saw defendant as the police brought him into the sheriff's office on 10 March 1989. Doster testified that defendant had a blank look on his face; he described defendant as looking like someone in shock.
Dr. Martin Youngelston, accepted by the court as an expert in forensic psychology, testified that defendant suffered from posttraumatic stress disorder. Dr. Youngelston opined that defendant had dissociated at the time of the shooting. He explained that "dissociation" means functioning in another frame of mind, another level of consciousness. In such a condition defendant might not have been able to distinguish right from wrong.
Connie Ridley, defendant's sister, testified that defendant stayed with her for four days after his release on bond. Ridley testified that during that time defendant acted normally. One day, however, they talked about the shooting, and defendant came back later in the day in a rage and acting wild.
Lex Angel, defendant's father, testified that he went to defendant's house the day before the murder to do some work with defendant. At some point, defendant became upset with his father and punched him on the chin. The two men then started wrestling. Lex Angel testified that defendant had never raised a hand against him and that defendant "looked at me just like he was looking through me."
The State presented evidence in rebuttal of defendant's insanity defense. Dr. Patricio Lara and Dr. James Gross, both forensic psychiatrists, diagnosed defendant as suffering from alcohol dependence and an adjustment disorder with a depressed mood. Both disagreed with Dr. Youngelston's diagnosis of post-traumatic stress disorder, and both were of the opinion that defendant's ability to distinguish between right and wrong and to appreciate the nature and quality of his actions on the day of the killing was not imparied.
In addition to the evidence described above, the State elicited testimony from several witnesses regarding threats made by defendant to Betsy Angel in the days immediately preceding the murder. Defendant contends these statements are inadmissible hearsay.
The statements at issue are as follows: Sheriff Homer Holbrooks testified for the State that Betsy Angel told him on 8 March 1989 "that she was being harrassed [sic] by [defendant]" and that "he is calling me and saying tonight's the night." Holbrooks also testified that Betsy called him to ask when it was legal to shoot someone.
Rebecca Ledford testified that on 8 March 1989, Betsy Angel told her that "she [Betsy] was going to be dead before the day was over." Ledford also testified that Betsy spoke of defendant's threats and that Betsy had called the Sheriff's Department. In Ledford's presence, Betsy received a phone call from defendant on 8 March 1989. According to Ledford, Betsy said that defendant told her "she [Betsy] didn't have as much pull in this town as she thought she did." Betsy said, "I'm not going to sit around and take the threats on my life lightly."
Carmella Pruitt also testified regarding several statements by Betsy Angel. Pruitt *727 testified that Betsy said on 8 March 1989, "[defendant] called me at 6:00 this morning and told me to enjoy the sunrise, because I would never see another one." Pruitt also testified that Betsy Angel told her defendant had said he would shoot Betsy. According to Pruitt, Betsy said on 9 March 1989, "well, I saw the sun rise this morning" and "all he has is a shot gun, and I can see a shot gun coming. So I'll be O.K."
In her testimony at trial, Sonja Vanhook described similar statements by Betsy Angel. Vanhook testified, "[s]he told me that she was not supposed to see the sun come up" and "she also told me that he had a shotgun and there was no way he could hide it, that she would be able to see it." According to Vanhook, Betsy Angel said that defendant had been threatening her since Tuesday, 7 March 1989. Vanhook testified that she was afraid for Betsy Angel because "I had talked to my sister and knew that [defendant] had threatened [Betsy]."
Travis Angel testified that his mother, Betsy Angel, described to him on 9 March 1989, a conversation she had with defendant that day. According to Travis, his mother stopped to get gasoline and defendant pulled in behind her and told her she "had been in the cross hairs all day and that he didn't havehe couldn't shoot her."
Thelma Angel testified about a conversation with Betsy Angel on 9 March 1989, in which "[defendant] had told her on several occasions that her days were numbered. She said that he had told her that he had had her in his sightings but couldn't pull the trigger, but he would."
Clyde McCall also testified briefly that Thelma and Doug Angel told him defendant had been threatening Betsy Angel all week prior to the killing.
The State gave defendant written notice of its intent to use these statements made by Betsy Angel to the witnesses listed above. Before trial, the court conducted a hearing on the admissibility of the statements listed in the State's notice. The court ruled that Holbrooks' testimony was admissible under N.C.G.S. § 8C-1, Rules 804(b)(5) and 803(1)-(3). The parties then argued briefly about the admissibility of the other statements listed in the State's notice, and the court overruled defendant's objection to their introduction at trial. When Holbrooks began testifying about the statements made by Betsy Angel, the court overruled defendant's objection. Later, in response to defendant's objection to the testimony of Rebecca Ledford, the court stated that it made "the same findings of fact and conclusions of law with reference to the statement to the testimony of Rebecca S. Ledford with regard to the statements made to her by the deceased, Betsy Angel...." The court overruled defendant's subsequent objections to the testimony of Pruitt, Vanhook, Travis Angel, and Thelma Angel, without explanation. Defendant made no objection to the testimony of Clyde McCall.
Defendant argues that the hearsay statements described above were inadmissible under N.C.G.S. § 8C-1, Rules 804(b)(5) and 803(1)-(3). Assuming arguendo that defendant is correct, we nonetheless conclude that the admission of these statements was harmless.
"`It is well established that the erroneous admission of hearsay, like the erroneous admission of other evidence, is not always so prejudicial as to require a new trial.'" State v. Faucette, 326 N.C. 676, 687, 392 S.E.2d 71, 77 (1990) (quoting State v. Ramey, 318 N.C. 457, 470, 349 S.E.2d 566, 574 (1986)). To show prejudicial error resulting from a violation of the Rules of Evidence alone, absent a constitutional issue, defendant must show that "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial...." N.C.G.S. § 15A-1443(a) (1988). When the error takes on a constitutional dimension, it is "prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt. The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless." N.C.G.S. § 15A-1443(b) (1988).
*728 Defendant argued to the trial court and assigned as error the introduction of inadmissible hearsay evidence in violation of both the Rules of Evidence and his state and federal constitutional rights to confront witnesses. In his brief and at oral argument, however, defendant argued only a violation of the Rules of Evidence. "Review [by this Court] is limited to questions... presented in the several briefs. Questions raised by assignments of error in appeals from trial tribunals but not then presented and discussed in a party's brief, are deemed abandoned." N.C.R.App.P. 28(a) (1991). Thus, defendant has abandoned his claim of constitutional violation and is entitled to a new trial only if he can demonstrate a reasonable possibility that, had the error in question not been committed, a different result would have been reached at trial. N.C.G.S. § 15A-1443(a) (1988).
We conclude that defendant is unable to carry his burden. The evidence that defendant caused the death of Betsy Angel by shooting her in the back with a .38 revolver was uncontroverted. Defendant acknowledges that the only contested issue was his state of mind at the time of the killing. If none of the challenged statements had been admitted, the jury still could have considered defendant's confession, as recounted in the testimony of Agent Moody, that he could not deny that he shot Betsy Angel. According to Moody, defendant said he had been separated from Betsy for several months and that he could not stand her "running around with other men." In his statement, defendant said that he awoke early on the morning of the killing and drove around for a while in a new truck he had bought the day before. Agent Moody testified that defendant said he drove to Richard Laughlin's house and took a .38 revolver and a box of shells from Laughlin's truck. Then, defendant drove to Mashburn Branch where Betsy lived. Defendant told Moody that he met his brother Steve on the way to Betsy's house.
Steve Angel's testimony corroborated defendant's confession. Steve testified that he saw defendant shortly before the killing and that defendant stated he was going to Alaska, but that he was going to kill Betsy first. Defendant previously had mentioned to Steve that he might be leaving town soon with a woman he met at Appalachian Hall. Soon after they met on 10 March 1989, Steve saw defendant driving away in the direction of Betsy's house. Neighbor Thelma Angel described defendant's actions upon his arrival at Betsy's house. She said defendant got out of his truck, reached down to pick up something from inside the cab, pulled down the tail of his coat, and then walked to the house.
The jury also had before it Travis Angel's testimony that he saw his mother and defendant arguing on the morning of the shooting. Travis testified that he ran downstairs when he heard his mother call his name. By the time he reached the foot of the stairs, Travis heard a gunshot and met his mother who was staggering around the corner. Travis then saw defendant holding the murder weapon, still smoking from its recent use.
Defendant's confession filled in details that Travis could not see. Defendant told Agent Moody he arrived at Betsy's house and went to the sliding glass door on the porch. He knocked and spoke with Betsy as she opened the door. He accused Betsy of running around, and she told him she would do what she wanted to do. Defendant then drew the pistol from the back waist band of his pants. When Betsy saw the gun, she turned to run away. Defendant told Moody that, as she turned, he shot her in the back. Defendant said to Moody that he just could not let Betsy run away from him. Defendant also told Moody the shooting was not an accident; he at first said that he did not intend to kill Betsy, but then he said "maybe I did, I shouldn't have gotten that gun."
Apart from the hearsay evidence of defendant's threats to Betsy Angel in the week before her death, there was substantial evidence that defendant formed the intent to kill and that he did so after premeditation and deliberation. Though defendant presented evidence that he may have suffered from post-traumatic stress disorder and that he may have "dissociated" *729 at the time of the killing, this evidence was met by plenary, credible evidence by the State in rebuttal. The weight of the evidence against defendant is so overwhelming that we cannot conclude there was a reasonable possibility of a different result had the inadmissible hearsay been excluded. If defendant had not abandoned his claim of constitutional error, we would conclude beyond a reasonable doubt that any such error was harmless.
NO ERROR.