STATE OF NORTH CAROLINA v. RICHARD TALMADGE KING

No. 82A95

(Filed 8 December 1995)

## 1. Evidence and Witnesses § 742 (NCI4th); Homicide § 250 (NCI4th)— noncapital first-degree murder—earlier altercation—events subsequent to—admission not prejudicial

There was no prejudicial error in a noncapital first-degree murder prosecution where the trial court admitted evidence that, following an altercation between the victim and defendant four years before this shooting, the victim's wife had asked for surveillance of their house by the sheriff's department and that a slow-moving vehicle had passed their house. Assuming error in the admission of the testimony, there was no prejudice because there was substantial other evidence to support a finding of premeditation and deliberation, the only real issue in the case, in that a bartender and several patrons witnessed defendant shooting the victim, these witnesses described defendant's aiming his gun at the victim's back and, with no provocation, firing three shots, other testimony showed that defendant went into the bar looking for the victim, defendant stated after the shooting, " I told you I'd kill you," and ill will had existed between the parties since a 1989 beating of defendant by the victim.

**Am Jur 2d, Appellate Review §§ 713, 753.**

**2. Criminal Law § 886 (NCI4th); Appeal and Error § 158 (NCI4th)— noncapital first-degree murder—jury instruction—no objection at trial—plain error not alleged—appellate review waived**

Appellate review of the trial court's instructions on jury questions was waived where defendant did not object at trial and did not allege plain error. However, the question was reviewed in the exercise of the Supreme Court's discretion.

**Am Jur 2d, Appellate Review §§ 614, 615.**

**3. Criminal Law § 867 (NCI4th)— jury questions—instruction that all jurors agree on questions—not plain error**

There was no plain error in a noncapital first-degree murder prosecution where the trial court instructed the jury that any question addressed to the court had to be that of the entire panel rather than of an individual juror. While that instruction was error, it did not rise to the level of plain error because nothing in the record suggests any irregularity in the jury's deliberations; when polled, no juror voiced disagreement with the verdict; and, in light of the substantial evidence supporting the verdict, it is improbable that the jury would have reached a different result had the trial court not given this instruction.

**Am Jur 2d, Trial § 1121.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgment imposing a sentence of life imprisonment entered by McLelland, J., at the 19 September 1994 Criminal Session of Superior Court, Orange County, upon a jury verdict of guilty of first-degree murder. Heard in the Supreme Court 10 October 1995.

*Michael F. Easley, Attorney General, by Marilyn R. Mudge, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Charlesena Elliott Walker, Assistant Appellate Defender, for defendant-appellant.*

PARKER, Justice.

Indicted for the first-degree murder of Johnnie Wayne Medlin (victim) in violation of N.C.G.S. § 14-17, defendant was tried noncap-

itally and found guilty as charged on the theory of premeditation and deliberation. The trial court sentenced defendant to life imprisonment.

At trial the evidence tended to show that on 11 July 1993, defendant told Frank Parrish, with whom defendant shared a trailer, that he was going down to "West End." That afternoon as Arnold "Sonny" Turner was walking out of West End Billiards in Hillsborough, he heard defendant call out to him. Defendant asked Turner if the victim was in the bar, and Turner told defendant that he was. Turner then got into his car and left. Defendant returned to his trailer and within a few minutes said to Parrish, "Wayne's at West End. I'm going down there," and left.

Larry Medlin was tending bar at West End Billiards on the afternoon of 11 July 1993. The victim was seated at the second or third barstool from the door and was watching an automobile race on television with several other patrons. Medlin heard a bang and turned around to see defendant shooting the victim in the back. Defendant fired three shots at the victim. Two shots hit the victim in the back, and one shot hit the victim in the left leg. One of the other patrons, John David Wagner, asked defendant what he was doing and told defendant to give him the gun. Wagner got the gun and handed it to Medlin; Medlin laid the gun on a rag on the bar. Witnesses testified that defendant made a statement to the effect, "I told you I'd kill you," or "I told him I'd get him." Other witnesses testified that they did not hear defendant say anything. Defendant then turned and walked out the door of the bar.

Defendant returned to his trailer and said to Parrish, "I did it." Parrish asked defendant whether he "gave him a touch up" or "popped" him. Defendant told Parrish that he had "popped" the victim three times. Parrish went down the hall and then heard defendant yell, "There's the law."

After obtaining information about the suspect in the shooting, Officer David Lineberry of the Hillsborough Police Department went to defendant's trailer. At approximately 3:00 p.m., Officer Lineberry entered the trailer with his gun drawn; and defendant asked him, "Why do you have that gun out?" When Officer Lineberry asked defendant where the gun was, defendant replied, "What gun?" Officer Lineberry asked defendant several times where the gun was; and defendant responded, "What gun?" and "What's going on?" While

Officer Lineberry was handcuffing defendant, defendant stated, "Yeah, I shot him."

After arresting defendant, Officer Lineberry took defendant first to West End Billiards and then to the police station. In response to questioning by Officer Lineberry and Detective Ross Fredrick, also of the Hillsborough Police Department, defendant stated that he saw the victim's truck and that the next thing he remembered was sitting in a patrol car at West End Billiards. When defendant began to look ill around 4:00 p.m., Officer Lineberry asked defendant whether he was on medication. Defendant indicated that he was on insulin, Prozac, "Terezenol [sic]," and Zantac and that he did not know when he had last taken his medications. Officer Lineberry called the rescue squad to check on defendant and also gave him a "honey bun" and a soft drink.

Other evidence presented at trial revealed that in 1989 defendant was severely beaten by the victim when the victim accused defendant of stealing some money. Officer Phillip White of the Hillsborough Police Department went with the victim and Larry Medlin to defendant's trailer shortly after the incident. Defendant refused to press charges against the victim and stated that he would take care of the matter himself. As a result of this beating, defendant suffered fractures around his eyes, nose, and mandible; bruises over his body; five or six fractured or broken ribs; and a closed head injury. Defendant was hospitalized approximately one week.

The victim's wife, Wendy Medlin, testified that after the 1989 fight between defendant and her husband, she called the Caswell County Sheriff's Department and arranged for a deputy to watch her house. Mark Currin of the Caswell County Sheriff's Department testified that he was assigned to surveillance of the Medlin house for a week in 1989. Mark Stanfield testified that at some time after the 1989 altercation, he and the victim and the victim's son, Pete, were standing in the victim's yard when a slow-moving vehicle approached; Stanfield grabbed Pete, and they both ducked. In response to questioning by Officer Lineberry about the 1989 altercation, defendant stated that if the police had done their job four years ago, the victim would have been arrested and the shooting never would have happened.

Defendant presented evidence that he suffered from various medical conditions. Dr. Billy W. Royal, a forensic psychiatrist, testified that he had examined defendant and diagnosed him as having major depression, organic brain disorder, and alcohol addiction; that

defendant suffered from both high and low glucose and that a low glucose level can cause a person to be confused and disoriented; and that defendant was having difficulty controlling his diabetes even in a controlled hospital setting. Dr. Royal further testified that, in his opinion, defendant was under the influence of mental or emotional disturbance at the time of the shooting and could not appreciate the criminality of his conduct. Dr. Royal also testified that defendant could not form the intent to kill but rather that defendant had responded reflexively when he saw the victim's truck.

Dr. Robert Conder, Jr., a clinical neuropsychologist, testified that defendant suffered from alcoholism, major depression, passive dependent personality disorder, organic brain syndrome, and preexisting learning disability. Dr. Conder testified that defendant's feelings "kind of come out of nowhere and grab him, and interrupt this sort of logical thinking that most of us have." Defendant's niece testified that several months before the shooting, she was at defendant's house talking with him when defendant stopped talking and stared straight ahead with his eyes open and not blinking for approximately five minutes.

Dr. John D. Butts, Chief Medical Examiner for the State of North Carolina, performed an autopsy on the victim. The autopsy revealed that the victim had suffered from three gunshot wounds. One bullet entered in the left back area and passed through the victim's spleen, aorta, and part of the liver. A second bullet entered in the right back, struck one of the victim's ribs, and came to rest in the tissue of the side. A third bullet entered just above the knee cap, traveled underneath the skin, and then exited the body on the middle side of the leg. Dr. Butts testified that the victim died as a result of the gunshot wound to the left back which passed through the victim's spleen, aorta, and liver.

[1] Defendant first challenges the admission of testimony pertaining to the altercation between defendant and the victim which occurred four years prior to the murder of the victim. Specifically, defendant contends that the testimony concerning the surveillance of the victim's home by the Caswell County Sheriff's Department and the testimony concerning the slow-moving vehicle which passed the victim's home were irrelevant and inadmissible. Defendant argues that the State failed to present any evidence that the victim's wife contacted the Sheriff's Department as the result of anything defendant had done. Likewise, the State failed to show that defendant was con-

nected in any way to the slow-moving vehicle. Without any preliminary evidence linking him to these events, defendant argues the testimony is irrelevant and inadmissible.

Moreover, the admission of this testimony was prejudicial since this evidence was submitted to show premeditation and deliberation, which was the only real issue in the case. Defendant contends that the State's evidence as to the existence of premeditation and deliberation was not otherwise convincing in that all the other evidence on this issue concerned the time frame immediately before, during, and after the killing; and defendant presented evidence that during this same time period, he was in a trance-like state, was unaware of his actions, and was thus incapable of premeditation and deliberation.

Assuming *arguendo* that admission of this testimony was error, we do not find that such error was prejudicial. Defendant is entitled to relief only if he can show a reasonable possibility that the outcome of the trial would have been different had the evidence been excluded. N.C.G.S. § 15A-1443(a) (1988). "Premeditation and deliberation relate to mental processes and ordinarily are not readily susceptible to proof by direct evidence. Instead, they usually must be proved by circumstantial evidence." *State v. Brown*, 315 N.C. 40, 59, 337 S.E.2d 808, 822-23 (1985), *cert. denied*, 476 U.S. 1164, 90 L. Ed. 2d 733 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988).

> Among the circumstances which may be considered as tending to show premeditation and deliberation are: (1) the want of provocation on the part of the victim, (2) the defendant's conduct and statements before and after the killing, (3) threats made against the victim by the defendant, (4) ill will or previous difficulty between the parties, (5) evidence that the killing was done in a brutal manner. *See State v. Calloway*, [305 N.C. 747, 751, 291 S.E.2d 622, 625-26 (1982)]; *State v. Potter*, 295 N.C. 126, [130-31,] 244 S.E.2d 397[, 401] (1978); *State v. Thomas*, 294 N.C. 105, [119,] 240 S.E.2d 426[, 436] (1978).

*State v. Myers*, 309 N.C. 78, 84, 305 S.E.2d 506, 510 (1983). In *State v. Battle*, 322 N.C. 69, 366 S.E.2d 454, *cert. denied*, 487 U.S. 1220, 101 L. Ed. 2d 911 (1988), this Court specifically stated that "evidence of the manner in which the killing occurred, the defendant's pointing a shotgun at [the victim's] back and shooting him, should support a finding that the killing was with premeditation and deliberation." *Id.* at 72-73, 366 S.E.2d at 456-57.

STATE v. KING

[342 N.C. 357 (1995)]

In the present case substantial evidence supports a finding of pre-meditation and deliberation even without the testimony regarding the police surveillance and the reported slow-moving vehicle. The testimony reveals that the bartender and several patrons of West End Billiards witnessed defendant shooting the victim. These witnesses described defendant's aiming his gun at the victim's back and, with no provocation whatsoever, firing three shots. Further, other testimony showed that defendant went into the bar looking for the victim; that after shooting the victim, defendant stated, "I told you I'd kill you"; and that ill will had existed between the parties since the 1989 beating.

In light of this evidence which taken together overwhelmingly supports a finding of premeditation and deliberation, we cannot say that a reasonable possibility exists that without the testimony objected to by defendant, the result at trial would have been different. N.C.G.S. § 15A-1443(a); *see State v. Angel*, 330 N.C. 85, 93, 408 S.E.2d 724, 728-29 (1991); *State v. Austin*, 320 N.C. 276, 285, 357 S.E.2d 641, 647, *cert. denied*, 484 U.S. 916, 98 L. Ed. 2d 224 (1987). These assignments of error are overruled.

[2] Defendant next contends that the trial court committed reversible error by instructing the jury that any question addressed to the court could not be that of an individual juror but had to be that of the entire panel. In giving the jury instructions, the court instructed the jury:

> [I]f in the course of your deliberation you think it necessary to ask me to explain something that I've said, you may come back and ask that. Or if you think any other question ought to be directed to the Court, you may come back and do that.
>
> But please bear in mind your request or question needs to be the request or question of the jury, not of a juror. You decide in advance whether you want to state it. And then you remember that you must state it in the courtroom.

Defendant contends it is both likely and reasonable that the jurors would have understood this instruction to mean that no questions could be asked of the court absent a consensus among the twelve jurors that the question should be asked. Defendant argues that this instruction impermissibly prevented individual jurors from seeking needed clarification about the applicable law directly from the court

in the absence of agreement among all the jurors that such clarification was necessary.

According to defendant the trial judge thus coerced a verdict, thereby violating defendant's due process rights under both the federal and state Constitutions. However, having failed to raise the alleged constitutional issues before the trial court, defendant has waived these constitutional arguments. *State v. Bussey*, 321 N.C. 92, 361 S.E.2d 564 (1987).

Similarly, in that defendant failed to timely object to this instruction at trial, this error would normally be deemed waived pursuant to Rule 10(b)(2) of the North Carolina Rules of Appellate Procedure, which provides:

> *Jury Instructions; Findings and Conclusions of Judge.* A party may not assign as error any portion of the jury charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly that to which he objects and the grounds of his objection; provided, that opportunity was given to the party to make the objection out of the hearing of the jury, and, on request of any party, out of the presence of the jury.

N.C. R. App. P. 10(b)(2). However, in *State v. Odom*, 307 N.C. 655, 300 S.E.2d 375 (1983), we held that the "plain error" rule was applicable to matters concerning jury instructions. Under the plain error rule, errors or defects affecting substantial rights may be addressed even though they were not previously brought to the attention of the court. *Id.* at 660, 300 S.E.2d at 378. A review of the record reveals that defendant does not allege plain error. Rule 10(c)(4) of the North Carolina Rules of Appellate Procedure provides:

> *Assigning Plain Error.* In criminal cases, a question which was not preserved by objection noted at trial and which is not deemed preserved by rule or law without any such action, nevertheless may be made the basis of an assignment of error where the judicial action questioned is specifically and distinctly contended to amount to plain error.

N.C. R. App. P. 10(c)(4). In the present case because defendant has failed to specifically and distinctly allege that the trial court's instruction amounted to plain error, defendant has waived any appellate review. *State v. Hamilton*, 338 N.C. 193, 449 S.E.2d 402 (1994). Nevertheless, in the exercise of our discretion under Rule 2 of the

Rules of Appellate Procedure, we elect to consider defendant's contention based on plain error.

**[3]** In order to rise to the level of plain error, the error in the trial court's instructions must be so fundamental that (i) absent the error, the jury probably would have reached a different verdict; or (ii) the error would constitute a miscarriage of justice if not corrected. *State v. Collins*, 334 N.C. 54, 62, 431 S.E.2d 188, 193 (1993).

We agree with defendant that the instruction given by the trial judge was error. North Carolina General Statutes section 15A-1234(a)(1) states that after the jury retires for deliberation, the judge may give additional instructions to "[r]espond to an inquiry *of the jury* made in open court." N.C.G.S. § 15A-1234(a)(1) (1988) (emphasis added). We agree with defendant that this statute does not mandate that all twelve jurors agree that a question be asked before it can be brought before the court. Rather, this statute merely requires that all communications between the court and the jury be conducted in open court with all members of the jury present. *Cf. State v. Ashe*, 314 N.C. 28, 331 S.E.2d 652 (1985) (holding that N.C.G.S. § 15A-1233(a), which pertains to a jury request during deliberation to review certain testimony or evidence, requires all jurors to be present in the courtroom when the request is made and when the trial court responds to the request).

Nonetheless, we find the trial court's instruction to the jury does not rise to the level of plain error. Defendant's hypothesis as to the effect of the instruction on the jury is nothing more than mere speculation. Nothing in the record suggests any irregularity in the jury's deliberations; and when polled, no juror voiced disagreement with the verdict. Moreover, in light of the substantial evidence in this case supporting the verdict, that the jury would have reached a different result had the trial court not given this instruction is improbable. Therefore, we overrule this assignment of error.

Having reviewed each of defendant's assignments of error brought forward on appeal, we conclude that defendant received a fair trial free from prejudicial error.

NO ERROR.