STATE OF NORTH CAROLINA v. JAMES ALAN GELL

No. 469A98

(Filed 4 February 2000)

**1. Jury— voir dire—plea agreement by witnesses—truthful testimony**

The trial court did not abuse its discretion in allowing the prosecutor to ask prospective jurors in a capital case a question about their ability to believe witnesses who testified pursuant to a plea agreement in which they promised to give "truthful" testimony in this case. The question did not invade the province of the jury to judge the credibility of the State's witnesses or suggest that the jury could disregard its duty to decide which testimony to believe, and the jurors were instructed that they were the sole judges of the credibility of each witness they heard.

**2. Jury— selection—challenge for cause—ability to set aside opinion**

The trial court in a capital case did not abuse its discretion in denying defendant's challenge for cause of a prospective juror, a State Highway Patrol trooper, who had discussed some facts about the case with the police chief, and a prospective juror who knew the victim and his family, was a friend of two potential State's witnesses, had discussed the case with people in town, and had formed an opinion as to who could have committed the crime, where the first juror clearly stated that he would not give the police chief's testimony any greater weight than that of a witness he did not know, and both jurors indicated unequivocally that they could set aside any previous opinions and render a decision based only on the evidence presented.

**3. Evidence— corroboration—prior statements—slight variations**

The trial court did not err by allowing an SBI agent to read two statements given to him by a State's witness for the purpose of corroborating the trial testimony of the witness, although the statements contained slight variations and some additional information, where the statements were substantially similar to and tended to strengthen and confirm the trial testimony of the witness, and they contained nothing directly contradicting the trial testimony.

STATE v. GELL

[351 N.C. 192 (2000)]

**4. Evidence— attorney-client privilege—prior inconsistent statement**

The trial court did not improperly permit a State's witness to assert her attorney-client privilege with regard to a prior inconsistent statement she made in conference with her attorney where the record reveals that defendant was specifically allowed to question the witness on the subject matter of her previous statement, her assertion of the attorney-client privilege did not prevent defendant from cross-examining the witness to ask her whether she had made the prior inconsistent statement, and there is no indication in the record that defendant desired to pursue any other aspect of the prior statement.

**5. Criminal Law— expression of opinion—denigration of counsel—comments by trial court—absence of prejudice**

The trial court did not express an opinion, denigrate defense counsel, or comment on witnesses and testimony in violation of N.C.G.S. §§ 15A-1222 and 15A-1223. Rather, the trial court made appropriate inquiries into evidentiary issues, asked questions designed to promote a proper understanding of the testimony, and generally supervised and controlled the course of the trial and the scope and manner of witness examination with care and prudence.

**6. Evidence— hearsay—inculpatory statements—motions to suppress and supporting affidavits**

The trial court did not err by refusing to permit defense counsel in a capital trial to cross-examine two State's witnesses about whether they claimed in motions to suppress their inculpatory statements and supporting affidavits signed by their attorneys that their statements were coerced since those documents were inadmissible hearsay, and the trial court did not prevent defendant from impeaching the witnesses by questioning them about the voluntariness of their statements.

**7. Homicide; Robbery— robbery and murder—conspiracy— sufficiency of evidence**

The State's evidence was sufficient for the jury on issues of defendant's guilt of conspirary with two codefendants to rob and murder the victim where it tended to show that one codefendant telephoned defendant from the victim's house, and defendant said that "he would be there in a little while"; defendant also told

this codefendant to look for the victim's money and that "when he got there he would have to hurt our friend"; defendant met the two codefendants at a store and told them he was going to rob the victim and showed them a knife concealed in his coat; defendant inquired if the victim kept guns in his house, and one codefendant told defendant that he did; defendant told the two codefendants to return to the victim's house and leave the back door open so that he could get in; the two codefendants did return to the victim's house, and the second codefendant entered and exited the house through the back door several times, and spoke with defendant, who was hiding in the barn; defendant entered the house undetected; after defendant shot the victim, the first codefendant showed him where the victim's money was kept; defendant and the two codefendants then left the house together and walked to one codefendant's grandmother's house; and defendant discarded evidence in the woods along the way.

**8. Criminal Law— prosecutor's argument—references to witness as liar—no gross impropriety**

Although the prosecutor's jury argument that a defense witness was lying and his references in the argument to the witness as a liar were improper, the argument was not so grossly improper that the trial court erred by failing to intervene ex mero motu where the witness had been impeached by prior convictions for embezzlement and writing worthless checks, and the evidence at trial supported the assertion that the witness testified falsely.

**9. Sentencing— capital—mitigating circumstances—no significant criminal history—pending collateral attack on conviction**

It was not error for the trial court to include a felony larceny conviction in the jury's consideration of the (f)(1) "no significant history of prior criminal activity" mitigating circumstance in a capital sentencing proceeding because the conviction was the subject of a collateral attack by a pending motion for appropriate relief at the time of defendant's murder trial. N.C.G.S. § 15A-2000(f)(1).

STATE v. GELL

[351 N.C. 192 (2000)]

**10. Sentencing— capital—mitigating circumstances—no significant criminal history—felonious larceny after murder—harmless error**

It was error for the trial court in a capital sentencing proceeding to permit the jury to consider defendant's conviction for felonious larceny of the victim's truck in its consideration of the (f)(1) "no significant history of prior criminal activity" mitigating circumstance where the theft of the truck occurred after the murder for which defendant was being sentenced, since the (f)(1) mitigating circumstance pertains only to criminal activity committed before the murder. However, this error was not prejudicial and did not entitle defendant to a new sentencing proceeding where evidence of defendant's theft of the victim's truck was already properly before the jury in the guilt phase of the trial, and the jury had before it evidence of defendant's conviction of misdemeanor larceny and extensive evidence of defendant's drug activity.

**11. Criminal Law— prosecutor's argument—capital sentencing—biblical reference—not impropriety**

The prosecutor's closing argument in a capital sentencing proceeding that "From the Old Testament and the Book of Numbers anyone who kills a person is to be put to death as a murderer upon the testimony of witnesses" and that the jury had heard testimony from witnesses supporting its verdict of guilty was not an improper use of religious sentiment, especially where, immediately preceding this argument, the prosecutor clearly referred to the secular laws of North Carolina by telling the jury that "the State has proven to you what is required by law for the imposition of the death penalty in this case."

**12. Criminal Law— prosecutor's argument—capital sentencing—biblical reference—not gross impropriety**

The prosecutor's closing argument in a capital sentencing proceeding that it is stated in Deuteronomy that "Cursed is the man who kills his neighbor secretly and all the people shall say amen" and that it was time to sentence defendndat to die "and let the people of Bertie County say amen" fell within the permissible practice of urging the jury to act as the voice of the community and was not so grossly improper that the trial court erred by failing to intervene ex mero motu.

**13. Criminal Law— prosecutor's argument—capital sentencing—addressing jurors by name**

The trial court did not err by allowing the prosecutor, after reminding jurors that they had affirmed that they could follow the law if the State proved what was required to impose the death penalty, to address the jurors by name and inform them that it ws time for them to impose the death penalty in this case.

**14. Criminal Law— prosecutor's argument—capital sentencing—absence of acknowledgment of wrongdoing—not comment on right to silence**

The prosecutor did not improperly comment on defendant's right to remain silent during closing argument in this capital sentencing proceeding when he stated that defendant had not acknowledged wrongdoing and asked the jurors if they had heard defendant apologize or express sorrow or remorse.

**15. Sentencing— capital—mitigating circumstances—nonstatutory—peremptory instruction not required**

The trial court did not err by refusing to give a peremptory instruction on the nonstatutory mitigating circumstance of "defendant having found a closer path to the Lord" where the testimony of a pastor who visited defendant in jail could support the jury's finding of this mitigating circumstance but was not uncontroverted evidence that defendant had "found" a closer path to the Lord.

**16. Sentencing— capital—mitigating circumstances—instructions—use of "must" and "may"**

The trial court's instructions in a capital sentencing proceeding that the jurors "must" consider mitigating circumstances in deciding Issue Three and that they "may" consider found mitigating circumstances in deciding Issue Four did not confuse the jury or create a contradiction in the instructions leaving the jury unguided in determining defendant's sentence. The instructions were nearly identical to those approved in prior cases, did not preclude a juror from considering mitigating circumstances he or she may have found, and properly instructed that the evidence in mitigation must be weighed against the evidence in aggravation.

**17. Sentencing— capital—constitutionality of statute**

The North Carolina death penalty statute, N.C.G.S. § 15A-2000, is constitutional.

**18. Sentencing— capital—death penalty not disproportionate**

A sentence of death imposed upon defendant was not excessive or disproportionate where the jury found defendant guilty of first-degree murder under the theories of malice, premeditation, and deliberation, lying in wait, and felony murder; the victim was shot twice at close range in his own home; the jury found as an aggravating circumstance that the murder was committed while defendant was engaged in the commission of an armed robbery; defendant engaged in a conspiracy with two young girls to commit the robbery and murder, relying on the victim's familiarity with and trust of the girls to gain entry to the victim's home; and although the jury considered twenty-four statutory and nonstatutory mitigating circumstances, only the catchall mitigating circumstance and the nonstatutory mitigating circumstance that defendant had a substance abuse problem were found by at least one juror to exist and to have mitigating value.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Meyer, J., on 2 March 1998 in Superior Court, Bertie County, upon a jury verdict finding defendant guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to his appeal of additional judgments was allowed by the Supreme Court on 22 March 1999. Heard in the Supreme Court 13 October 1999.

*Michael F. Easley, Attorney General, by David F. Hoke, Assistant Attorney General, for the State.*

*Nora Henry Hargrove for defendant-appellant.*

FRYE, Chief Justice.

Defendant was indicted on 7 August 1995 for first-degree murder, conspiracy to commit murder, armed robbery, and conspiracy to commit armed robbery. He was tried capitally, and the jury returned a verdict of guilty of first-degree murder on the basis of malice, premeditation, and deliberation; under the theory of lying in wait; and under the felony murder rule. The jury also found defendant guilty of conspiracy to commit murder, robbery with a firearm, and conspiracy to commit robbery with a firearm.

In a separate capital sentencing proceeding conducted pursuant to N.C.G.S. § 15A-2000, the jury found as an aggravating circumstance that defendant committed the murder while engaged in the commis-

sion of robbery with a firearm. At least one juror found the existence of one nonstatutory mitigating circumstance and an unspecified catchall mitigating circumstance. The jury recommended and the trial court imposed a sentence of death for the conviction of first-degree murder. The trial court also sentenced defendant to terms of imprisonment for the armed robbery and conspiracy convictions.

For the reasons discussed herein, we conclude that defendant's trial and capital sentencing proceeding were free of prejudicial error and that the death sentence is not disproportionate. Accordingly, we uphold defendant's convictions and sentence of death.

The State's evidence presented at trial tended to show that the victim, Allen Jenkins, was killed in his home in Aulander, North Carolina, by two shotgun wounds to the chest, fired at close range by his own shotgun, sometime during the evening of 3 April 1995. The State's primary witnesses were two girls, aged fifteen at the time of the murder, Crystal Morris and Shanna Hall. Morris and Hall both testified pursuant to plea agreements; the girls pled guilty to second-degree murder and armed robbery in exchange for their truthful testimony, and charges against them of first-degree murder and conspiracy were dropped.

In April of 1995, Crystal Morris lived with Shanna Hall and Hall's parents in their home. Hall was dating defendant, and defendant, Hall, and Morris used drugs together. Morris and Hall also knew the victim, Allen Jenkins; he allowed the girls to visit his home and drink alcohol there.

The day of the murder, defendant drove Morris and Hall to Aulander. Morris and Hall went to Jenkins' home, and all three were drinking wine coolers. At one point in the afternoon, Jenkins left his home to go to the nearby Red Apple store to purchase more wine coolers. While Jenkins was gone, Morris telephoned defendant. During the telephone conversation, defendant told Morris that he would have to "hurt our friend," referring to Jenkins, and that he would meet Morris and Hall at the Red Apple. When Jenkins returned home, Morris and Hall walked to the Red Apple, where they met defendant. Morris, Hall, and defendant left the store and began walking. At some point, the three stopped to talk. Defendant was carrying a knife inside his coat, and he told Hall and Morris that he was going to rob Jenkins.

Morris and Hall returned to Jenkins' home and entered through the back door. Morris went with Jenkins to his bedroom to help him

connect a VCR. Hall used the bathroom, then left the house and saw defendant, who was outside. Hall exited and reentered the house several times, speaking once to defendant, who did not respond. Morris remained in the house with Jenkins, and the two went into the kitchen to get ice for a drink. Morris testified that as she followed Jenkins from the kitchen back toward his bedroom, defendant, standing partially behind the bedroom door, shot Jenkins twice. Hall testified that she was outside the house when she heard one shot fired. Hall went inside and saw defendant with a gun, yelling at Morris to tell him where the money was. Morris told defendant that Jenkins kept his money in a cabinet. Defendant pried open the cabinet and took money and a checkbook; defendant also carried away from the house a set of keys, the shotgun, a box of shotgun shells, and two empty shells.

After the murder, Morris, Hall, and defendant left, walking across a field behind Jenkins' house. Defendant threw the gun, shells, knife, and keys into some woods that bordered the field. As they walked, defendant stopped under a street light and said, "Let's see how much his life cost him," and counted out approximately $400.00 from the victim's wallet.

The three then walked to Morris' grandmother's home, where Morris called her boyfriend, Gary Scott. Scott arrived shortly thereafter and drove the three home, dropping off defendant first and then taking Morris and Hall to Hall's house. Lacy White testified that he gave defendant a ride about midnight and that when defendant gave him gas money, it looked like defendant had about $500.00.

In the early hours of the morning of 4 April 1995, defendant went to Hall's home. Hall eventually accompanied defendant to Virginia and Maryland in a stolen pickup truck. While defendant was driving, Hall tossed a wallet, some keys, and a checkbook out the window off a bridge. Defendant returned Hall to North Carolina on 6 April 1995. The gun and other evidentiary items were retrieved in July 1995, after Morris showed police their location in the woods behind Jenkins' house.

Jenkins' body was found on 14 April 1995, and an autopsy was performed the next day. The state of decomposition of the body indicated a time of death of between one and two weeks prior to the autopsy. Additionally, development of larvae found on the body was consistent with Jenkins having been killed on 3 April 1995.

Defendant did not testify. However, several witnesses testified on defendant's behalf. The primary theory of the defense was that the date of death proposed by the State was incorrect and that defendant was not involved in the murder at all. Defendant also presented testimony and evidence attempting to impeach the State's two main witnesses, Morris and Hall.

[1] In defendant's first assignment of error, he contends the trial court erred by allowing the prosecutor to refer repeatedly to the potential testimony of State's witnesses as "truthful" during jury *voir dire*. Specifically, defendant objected to the following question asked of prospective jurors:

> You may hear testimony from a witness who is testifying pursuant to a plea agreement. This witness has pled guilty to a lesser degree of murder in exchange for their promise to give truthful testimony in this case.
>
> Do you have any opinions about plea agreements that would make it difficult or impossible for you to believe the testimony of a witness who might testify under a plea agreement?

Defendant contends that whether testimony is truthful is for the jury to decide after hearing the evidence and that it was error to indoctrinate jurors into thinking of the State's witnesses as truthful because they had promised to give truthful testimony.

The goal of jury selection is to ensure that a fair and impartial jury is empaneled. *See State v. Fullwood*, 343 N.C. 725, 732, 472 S.E.2d 883, 886 (1996), *cert. denied*, 520 U.S. 1122, 137 L. Ed. 2d 339 (1997); *State v. Gregory*, 340 N.C. 365, 388, 459 S.E.2d 638, 651 (1995), *cert. denied*, 517 U.S. 1108, 134 L. Ed. 2d 478 (1996). Regulation of the *voir dire* is a matter within the broad discretion of the trial court. *Fullwood*, 343 N.C. at 732, 472 S.E.2d at 887. " 'In order for a defendant to show reversible error in the trial court's regulation of jury selection, a defendant must show that the court abused its discretion and that he was prejudiced thereby.' " *Id.* (quoting *State v. Lee*, 335 N.C. 244, 268, 439 S.E.2d 547, 559, *cert. denied*, 513 U.S. 891, 130 L. Ed. 2d 162 (1994)).

The trial court in this case did not abuse its discretion by allowing the disputed question. The prosecutor's *voir dire* inquiry merely outlined the plea agreement under which witnesses might testify and sought to determine whether a plea agreement would have a negative effect on prospective jurors' ability to believe testimony from such

witnesses. The question did not invade the province of the jury to judge the credibility of the State's witnesses, nor did it suggest that the jury could disregard its duty to decide which testimony to believe.

Further, at trial, the jurors were instructed that they were the sole judges of the credibility of each witness they heard. They were additionally instructed as follows:

> Now, there is evidence which tends to show that two witnesses were testifying under an agreement with the prosecutor for a charge reduction in exchange for their testimony. If you find that they or either of them testified in whole or in part for this reason, you should examine that testimony with great care and caution in deciding whether or not to believe it.

> If after doing so, you believe that testimony in whole or in part, you should treat what you believe the same as any other believable evidence.

Jurors are presumed to follow the court's instructions. *See Gregory,* 340 N.C. at 408, 459 S.E.2d at 663. We conclude that the trial court did not abuse its discretion in permitting the prosecutor to engage in this questioning during *voir dire* and that defendant was in no way prejudiced by the questioning. This assignment of error is without merit.

[2] By his next two assignments of error, defendant contends that the trial court erred in refusing to excuse prospective jurors Owens and Lassiter for cause and in later denying his motion for additional peremptory challenges. Defendant asserts that both prospective jurors exhibited an extensive knowledge of people involved in the investigation and people who testified at trial and that they had been privy to conversations about the case by those "in the know." Defendant also contends that Owens' answers indicated he would give greater credibility to a law enforcement witness he knew personally.

Prospective juror Owens was a State Highway Patrol trooper, and he admitted that he had discussed with his friend Police Chief Gordon Godwin some facts about the case. Prospective juror Lassiter knew the victim and his family, and he was a friend of two potential witnesses for the State. Lassiter also had discussed the case with people in town and had formed an opinion "as to how this case happened

and who could have done it." However, after a careful review of the *voir dire* transcript, it is clear that both Owens and Lassiter indicated unequivocally that they could listen to the evidence and render an impartial decision based solely on the evidence presented in court. The trial court engaged in the following colloquy with prospective juror Owens:

Q. Mr. Owens, if Chief Godwin testified and you found his testimony to be believable and then someone you did not know testified and you found their testimony to be believable, would you give the Chief's testimony any greater weight than that other believable witness?

A. No, sir.

Q. Do you have any reservations at all about your ability to set aside what you heard and decide this case solely on what you hear from this witness stand, the arguments of the attorneys, and the instructions of the court?

A. No, sir.

Q. You have no reservations about that?

A. No, sir.

Likewise, the trial court confirmed Lassiter's ability to set aside any opinion he might have formed previously, as demonstrated by the following questioning:

Q. Mr. Lassiter, you heard me say to the jurors as a body earlier that the question is not whether you ever had an opinion about the case but whether you can set it aside, put it out of your mind and decide this case solely on the basis of the evidence you hear from the stand, the arguments of the attorneys and the charge of the court. Do you remember me saying that?

A. Yes, sir.

Q. And the question is can you do that?

A. Yes, sir.

Q. Do you have any reservation at all about your ability to do that?

A. No, sir.

Q. All right, sir. You firmly believe that you can set aside anything you knew or any opinion you had formed at an earlier time and decide this case based solely on the evidence, the arguments of counsel, and the charge of the court?

A. Yes, sir.

The granting of a challenge for cause rests in the sound discretion of the trial court and will not be disturbed absent a showing of abuse of that discretion. *See State v. Trull*, 349 N.C. 428, 441-42, 509 S.E.2d 178, 188 (1998), *cert. denied*, —— U.S. ——, 145 L. Ed. 2d 80, 68 U.S.L.W. 3224 (1999); *State v. Hartman*, 344 N.C. 445, 458, 476 S.E.2d 328, 335 (1996), *cert. denied*, 520 U.S. 1201, 137 L. Ed. 2d 708 (1997). Because both prospective jurors indicated that they could render an impartial decision based only on the evidence presented and because Owens clearly stated that he would not give Chief Godwin's testimony greater weight than that of a witness he did not know, defendant shows no abuse of discretion in the trial court's denial of his challenges for cause. *See Hartman*, 344 N.C. at 461, 476 S.E.2d at 337; *State v. Cummings*, 326 N.C. 298, 308, 389 S.E.2d 66, 71 (1990). These assignments of error are rejected.

[3] Next, defendant assigns error to the trial court's allowing SBI Agent Dwight Ransome to read to the jury two statements given to him by Crystal Morris on 26 July 1995 and 12 August 1997. The jurors were furnished copies of each statement as Ransome read it. Defendant objected, arguing that the statements were not corroborative and that they contained inadmissible hearsay. The objections were overruled and defendant moved for a mistrial, which was also denied.

Defendant asserts that this issue is similar to that raised in *State v. Frogge*, 345 N.C. 614, 481 S.E.2d 278 (1997). In *Frogge*, the defendant allegedly described to a fellow inmate the murders of the defendant's father and stepmother. The inmate later gave a statement to the police regarding the defendant's admissions. However, at trial, the inmate, testifying as a witness for the State, recounted a different version of the events. The trial court permitted a police detective to read the contents of the witness' prior statement, which was offered for corroborative purposes. This Court concluded that the witness' prior statement "contained information manifestly contradictory to his testimony at trial and did not corroborate the testimony" and, therefore, held that it was error for the trial court to admit the prior statement for the purpose of corroboration. *Id.* at 618, 481 S.E.2d at 280.

It is well established that a witness' prior consistent statements may be admitted to corroborate the witness' sworn trial testimony but prior statements admitted for corroborative purposes may not be used as substantive evidence. *See, e.g., State v. Harrison*, 328 N.C. 678, 681, 403 S.E.2d 301, 303-04 (1991). However, "[i]n order to be corroborative and therefore properly admissible, the prior statement of the witness need not merely relate to specific facts brought out in the witness's testimony at trial, so long as the prior statement in fact tends to add weight or credibility to such testimony." *State v. Ramey*, 318 N.C. 457, 469, 349 S.E.2d 566, 573 (1986); *see also State v. Mickey*, 347 N.C. 508, 519, 495 S.E.2d 669, 676, *cert. denied*, 525 U.S. 853, 142 L. Ed. 2d 106 (1998); *State v. McDowell*, 329 N.C. 363, 384, 407 S.E.2d 200, 212 (1991). However, the State may not introduce as corroboration prior statements that actually, directly contradict trial testimony. *See McDowell*, 329 N.C. at 384, 407 S.E.2d at 212.

Defendant points to several instances in which he contends Morris' earlier statements to police were not corroborative of her testimony at trial. For example, Morris' statement of 26 July 1995, State's exhibit 10, contained the following statement: "The plan was for Morris and Shanna to get Alan Gell into Allen Ray Jenkins' house or to keep Allen Ray so that he could not see Alan Gell come into the house." At trial, Morris testified that "Alan told Shanna and I to go back to the residence and leave the back door open so that when he came he could get in." We disagree with defendant's characterization of Morris' prior statements and trial testimony. While the earlier statements contained slight variations and some additional information, they contained nothing directly contradicting the witness' trial testimony, as was the case in *State v. Frogge*.

Upon careful review of both Morris' out-of-court statements and her trial testimony, we conclude that the prior statements were substantially similar to and tended to strengthen and confirm her trial testimony. Both the earlier statements and the trial testimony indicated that Morris was aware of defendant's intention "to hurt our friend," referring to Jenkins. Both revealed that defendant sought Morris' and Hall's assistance in entering Jenkins' home through an unlocked door, and both revealed that defendant had a knife and intended to use it to rob Jenkins. In both her prior statements and in her testimony, Morris related that she told defendant there was a gun in the house. Further, the description of events immediately surrounding Jenkins' shooting recounted in Morris' 26 July 1995 statement was consistent with her trial testimony. For these reasons, we

STATE v. GELL

[351 N.C. 192 (2000)]

conclude that it was not error for the trial court to permit Agent Ransome to read Morris' prior statements to the jury.

Morris' 26 July 1995 statement also contained the phrase, "Dewayne said that 'Alan has told me all about it.'" Defendant contends this was inadmissible double hearsay which implied that defendant told Dewayne Conner about the robbery and murder. However, Morris' prior statement, which contained this reference to what Conner said, was not offered to prove the truth of the matter asserted, but rather to bolster the testimony Morris gave at trial. Therefore, the statement was not hearsay. *See* N.C.G.S. § 8C-1, Rule 801(c) (1999).

[4] By his next assignment of error, defendant argues that the trial court erred in permitting witness Shanna Hall to assert her attorney-client privilege with regard to a prior inconsistent statement Hall made in conference with her attorney. Defendant contends that Hall's prior statement was admissible and that the court's ruling denied him the right of confrontation, the right to cross-examination, and the right to present a defense. We disagree.

During a conference with her attorney on 5 July 1995, and in the presence of Crystal Morris, Hall made a statement concerning the events surrounding the murder, which was recorded and later reduced to writing. In this statement, Hall said that she was sitting on the porch when she heard the gunshot, yet she testified at trial that she was standing by the barn. When defendant attempted to cross-examine Hall about this statement, the trial court allowed her to assert her attorney-client privilege. Defendant contends that the privilege was waived, because the statement was later published to others, and that the statement should have come in under N.C.G.S. § 8C-1, Rule 106.

We have fully examined the transcript surrounding the cross-examination of Hall. It reveals that defendant was specifically allowed to question Hall on the subject matter of her previous statement and that her assertion of attorney-client privilege did not prevent defendant from cross-examining Hall to obtain the information he sought. During a *voir dire* of the witness out of the presence of the jury, defense counsel questioned Hall as follows:

Q. Ms. Hall, do you recall making a statement on July 5, 1995, in a conference with you, Crystal Morris, and your attorney, Mr. Perry Martin? Do you recall that?

STATE v. GELL

[351 N.C. 192 (2000)]

A. Yes, sir.

Q. Do you recall in that statement of July 5, 1995, that you made the statement that I was feeling kind of sick, so after I went into the bathroom, I walked outside and was sitting there. I was sitting on the porch getting some air and I heard—I didn't hear but one gunshot. And so I walked in and when I walked in, I was behind [Crystal] and I didn't see him do it, but I walked in after he did it.

Do you now recall making that statement that you were sitting on the porch when you heard the shot?

A. No, I don't recall that. I was not sitting on the porch.

Q. I understand you've testified that you were not sitting on the porch, but my question is did you ever make that statement to you[r] lawyer that you were, in fact, sitting on the porch?

A. Yes, I did.

. . . .

Q. . . . That would be in contradiction as to what you testified on direct examination; would that be correct? In other words, you said on direct, and I believe also on cross, that you were standing out by the barn, I believe, when you heard the first shot.

A. Yes, that is where I was.

Q. But you do admit to making the statement about being on the porch when you heard the shot. Is that what I understood you to say? I'm not saying it's correct. I'm just saying that you made the statement.

A. Yes.

THE COURT: Anything further?

[DEFENSE COUNSEL]: No, sir.

After further discussion between defense counsel, the prosecutor, and the trial court, the court ruled as follows:

The witness has not published the statement to anyone. Therefore, I'm going to recognize and uphold her exercise of her privilege, her attorney-client privilege with regard to the statement.

Because the State doesn't object, I'm going to allow the defense attorney to ask her the question in the presence of the jury as to whether or not she had previously told anyone that she heard the gunshot while she was seated on Mr. Jenkins' back porch and allow her to explain her answer.

Without objection, and without Hall's asserting any attorney-client privilege, defense counsel did ask Hall the question. Further, defense counsel read that portion of the statement to Hall, and she confirmed making it. Although defense counsel originally proposed questioning Hall as to "statements that she gave on July 5th, 1995," there is no indication in the transcript of Hall's *voir dire*, or her later questioning before the jury, that defendant wanted to or attempted to pursue any other aspect of the 5 July 1995 statement. Defendant's argument that he was not permitted to fully cross-examine Hall is not credible in light of the trial record.

**[5]** Defendant's next issue concerns numerous instances in which defendant contends the trial court expressed an opinion, denigrated defense counsel, and commented on witnesses and testimony, violating N.C.G.S. § 15A-1222 and § 15A-1232 and depriving defendant of a fair trial, due process, and an impartial tribunal in violation of the state and federal Constitutions.

N.C.G.S. § 15A-1222 provides that "[t]he judge may not express during any stage of the trial, any opinion in the presence of the jury on any question of fact to be decided by the jury," and N.C.G.S. § 15A-1232 requires that "[i]n instructing the jury, the judge shall not express an opinion as to whether or not a fact has been proved." This Court has said that "[i]n evaluating whether a judge's comments cross into the realm of impermissible opinion, a totality of the circumstances test is utilized." *State v. Larrimore*, 340 N.C. 119, 155, 456 S.E.2d 789, 808 (1995). Further, a defendant claiming that he was deprived of a fair trial by the judge's remarks has the burden of showing prejudice in order to receive a new trial. *See State v. Barnard*, 346 N.C. 95, 105-06, 484 S.E.2d 382, 388 (1997).

Defendant makes sixteen assignments of error regarding the trial court's alleged improper expressions of opinion and improper comments. We have fully examined the trial transcript and conclude that, when viewed in the totality of circumstances, defendant fails to show prejudice. The trial court made appropriate inquiries into evidentiary issues, asked questions designed to promote a proper understanding of the testimony, and generally supervised and controlled

the course of the trial and the scope and manner of witness examination with care and prudence. These assignments of error are without merit.

[6] Defendant next raises two assignments of error regarding the trial court's prohibition of evidence that witnesses Morris and Hall previously had alleged that their inculpatory statements were coerced. Prior to tendering their pleas, Morris and Hall had filed motions to suppress their statements of 26 July 1995, alleging, *inter alia*, that the statements had been coerced and were otherwise taken in violation of their constitutional rights. These motions were subsequently allowed in part and denied in part, after which Morris and Hall immediately entered pleas.

Defendant wanted to question Morris and Hall about whether they had claimed the statements were coerced. The trial court refused to permit Morris and Hall to be cross-examined with regard to the motions to suppress and supporting affidavits because the documents had been signed by the witnesses' attorneys and not the witnesses personally. Defendant contends this ruling was erroneous because it limited his right to impeach Morris and Hall.

A review of the trial record reveals that after a lengthy discussion of the issue, out of the presence of the jury, between the trial court, the prosecutor, and defense counsel, the following colloquy occurred:

[COURT]:  All right. Essentially what you are doing is you have marked as defendant's exhibit number 4, Mr. Warmack's motion to suppress in the case of State against Crystal A. Morris, which is not this case that we're trying. Do you want to cross-examine her concerning a statement in Mr. Warmack's motion to suppress. The State has objected to it. All right.

[DEFENSE]:  Yes, sir.

[COURT]:  I'm going to sustain the State's objection.

[DEFENSE]:  Yes, sir, we note an exception.

[COURT]:  If you haven't had your say, you go ahead.

[DEFENSE]:  I think I have indicated to the court.

[COURT]:  All right. I'm going to sustain the State's objection. There may be another method that you would want to pursue.

[DEFENSE]: Well, I think I can probably ask her directly on examination was she coerced into making it.

[COURT]: Certainly. And if you want to show that her attorney made some statement, I suppose you could call him.

The trial court ruled similarly regarding defendant's attempt to introduce the motion to suppress in Shanna Hall's case.

The motions to suppress and supporting affidavits were inadmissible hearsay. *Cf. State v. Edwards*, 315 N.C. 304, 337 S.E.2d 508 (1985) (search warrant and supporting affidavit); *Gouldin v. Inter-Ocean Ins. Co.*, 248 N.C. 161, 102 S.E.2d 846 (1958) (motion and affidavit for leave to file supplemental answer). Therefore, the trial court correctly prohibited defendant from questioning Morris and Hall regarding the specific documents filed on their behalf in their individual cases. However, the record shows that defendant was not prevented from impeaching the witnesses by questioning them about the voluntariness of their statements. We find no error in the trial court's handling of this issue, and therefore, we reject defendant's argument.

[7] By his next assignment of error, defendant asserts that the evidence was insufficient to prove beyond a reasonable doubt that there was a conspiracy to commit murder or a conspiracy to commit armed robbery. A criminal conspiracy is an agreement, express or implied, between two or more persons, to do an unlawful act or to do a lawful act in an unlawful way or by unlawful means. *See State v. Barnes*, 345 N.C. 184, 216, 481 S.E.2d 44, 61 (1997), *cert. denied,* 523 U.S. 1024, 140 L. Ed. 2d 473 (1998). Defendant contends that Crystal Morris' and Shanna Hall's testimony did not support a finding of an agreement between the three codefendants to rob or kill Jenkins.

The State presented the following evidence from which the jury could conclude that a conspiracy existed between Morris, Hall, and defendant to rob and murder Jenkins. Morris telephoned defendant from the victim's house, and defendant said that "he would be there in a little while." Defendant also told Morris to look for Jenkins' money and that "when he got there he would have to hurt our friend." Defendant said he would meet Morris and Hall at the Red Apple store, and the three codefendants did in fact meet there. Defendant told Hall and Morris that he was going to rob Jenkins and showed them a knife concealed in his coat. Defendant inquired if Jenkins kept guns in his house, and Morris told defendant that he did. Defendant told Morris and Hall to return to Jenkins' house and leave the back door

open so that he could get in. Morris and Hall did return to Jenkins' home. Hall entered and exited the house through the back door several times, speaking to both Morris, who was in the house with Jenkins, and defendant, who was hiding in the barn. Defendant entered the house undetected. After defendant shot Jenkins, Morris showed him where Jenkins' money was kept. The three codefendants then left the house together and walked to Morris' grandmother's house, and defendant discarded evidence in the woods along the way.

"Direct proof of the charge [of conspiracy] is not essential, for such is rarely obtainable. It may be, and generally is, established by a number of indefinite acts, each of which, standing alone, might have little weight, but, taken collectively, they point unerringly to the existence of a conspiracy." *State v. Whiteside*, 204 N.C. 710, 712, 169 S.E. 711, 712 (1933), *quoted in State v. Gibbs*, 335 N.C. 1, 48, 436 S.E.2d 321, 348 (1993), *cert. denied*, 512 U.S. 1246, 129 L. Ed. 2d 881 (1994). Further, a conspiracy may be an implied understanding rather than an express agreement. *See State v. Arnold*, 329 N.C. 128, 142, 404 S.E.2d 822, 831 (1991). Viewing the evidence in the light most favorable to the State, *see State v. Williams*, 345 N.C. 137, 142, 478 S.E.2d 782, 784 (1996), we conclude that the evidence in this case was sufficient to submit the conspiracy charges to the jury.

[8] Defendant's eighth argument is that the trial court erred in failing to intervene *ex mero motu* when the prosecutor argued to the jury that witness Peggy Johnson was lying. Johnson testified that Crystal Morris told her that defendant was not the person who committed the murder. The conversation between Johnson and Morris allegedly occurred while the two were in the Bertie Martin Regional Jail in August of 1997, at the time Morris entered her plea agreement. On rebuttal, Johnson's testimony was discredited by jail records indicating that she and Morris had never been incarcerated at the same time. However, overnight, defense counsel found computer records showing that Morris had been in the Bertie Martin Regional Jail from 25-27 June 1997, a time when Johnson was also incarcerated there. Defendant was permitted to reopen the case to present the surrebuttal evidence, but Johnson was not reexamined.

During his closing argument, the prosecutor told the jury:

The last witness of theirs I want to mention is this Peggy Johnson. Now, Peggy Johnson was lying. There's just no other way to put it. Peggy Johnson sat on that witness [sic] and told you—I know you heard it—that Crystal Morris told her after her

STATE v. GELL

[351 N.C. 192 (2000)]

plea agreement that she did that because her family pressured her to do it, and that the defendant didn't do the murder.

Well, that is baloney. Peggy Johnson was not even in jail with Crystal Morris when Crystal Morris did her plea. That was an out and out lie. How can you base reasonable doubt or any doubt on the testimony of a liar? You can't. She's even a convicted liar.

Defendant contends, and we agree, that this argument was improper. While a prosecutor may argue to the jury that it should not believe a witness, *see State v. Scott*, 343 N.C. 313, 344, 471 S.E.2d 605, 623 (1996), it is improper for a lawyer to call a witness a liar, *see State v. Locklear*, 294 N.C. 210, 217, 241 S.E.2d 65, 70 (1978); *State v. Miller*, 271 N.C. 646, 659, 157 S.E.2d 335, 345 (1967). The prosecutor violated this rule in the instant case.

Nevertheless, we have said that "the impropriety of the argument must be gross indeed in order for this Court to hold that a trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it." *State v. Johnson*, 298 N.C. 355, 369, 259 S.E.2d 752, 761 (1979); *see also Barnard*, 346 N.C. at 106, 484 S.E.2d at 388. In order to establish that the trial court abused its discretion by failing to intervene *ex mero motu*, a "defendant must show that the prosecutor's comments so infected the trial with unfairness that they rendered the conviction fundamentally unfair." *State v. Davis*, 349 N.C. 1, 45, 506 S.E.2d 455, 467 (1998), *cert. denied*, 526 U.S. 1161, 144 L. Ed. 2d 219 (1999). Defendant has not done so in this case.

We note initially that Johnson's credibility had been impeached by her prior convictions for embezzlement and for writing worthless checks. In her direct testimony, Johnson claimed to have talked to Morris while the two were jailed together in the Bertie Martin Regional Jail when Morris was there "to sign a plea bargain for a murder charge." Subsequently, records presented by Captain William White of the Bertie Martin Regional Jail showed that Johnson was not incarcerated there during the time period, 8-13 August 1997, when Morris was there to enter her plea. Therefore, although jail records admitted on surrebuttal showed that Morris and Johnson may have been in jail together for two days in June 1997, there could have been no such conversation as Johnson contended at the time she testified that it occurred. Thus, the evidence presented during trial supported the assertion that Johnson testified falsely, and we conclude that the prosecutor's argument was not so grossly improper that the trial

court erred by failing to intervene *ex mero motu*. This assignment of error is rejected.

By two assignments of error, defendant next contends that the trial court erred in its treatment of the (f)(1) mitigating circumstance, that "[t]he defendant has no significant history of prior criminal activity." *See* N.C.G.S. § 15A-2000(f)(1) (1999). In support of this mitigating circumstance, defendant sought to admit his prior criminal record consisting of one conviction for misdemeanor larceny of a tractor. The State successfully argued that the trial court should also admit defendant's conviction for felonious larceny resulting from the theft of the truck in which defendant and Hall fled on the night of the murder. Despite defendant's objection, the trial court instructed the jury that "defendant's record consisted of one felony larceny conviction of a truck and one misdemeanor larceny conviction of a tractor."

[9] Defendant contends that it was error to include the felony larceny conviction in the jury's consideration of the (f)(1) mitigating circumstance because the conviction for the truck theft was the subject of collateral attack by a pending motion for appropriate relief at the time of defendant's murder trial. Defendant cites no authority in support of this position, and we have found none. This argument is rejected.

[10] Defendant also contends that it was error to permit the jury to consider his felony larceny conviction because the theft of the truck occurred after the homicide for which defendant was being sentenced, citing *State v. Coffey*, 336 N.C. 412, 418, 444 S.E.2d 431, 434 (1994). We agree. This Court stated in *Coffey* that "it is clear that the mitigating circumstance at N.C.G.S. § 15A-2000(f)(1) pertains only to that criminal activity committed *before* the murder." *Id.* (emphasis added). We reject the State's argument that the felony larceny was properly considered in the instant case because it was part of a "continuous transaction" with the murder. The continuous transaction analysis is misplaced in this context. The language of N.C.G.S. § 15A-2000(f)(1) is clear, and we reaffirm our decision in *Coffey* that "history of prior criminal activity" as used in that statute "refers to criminal activity occurring before the murder." *Id.*

Nevertheless, this case is distinguishable from *Coffey*, in which we ordered a new sentencing proceeding because the trial court improperly allowed consideration of criminal activity occurring after the murder for which the defendant was being sentenced. In *Coffey*, the defendant was convicted of the first-degree murder of a child.

The murder had occurred in 1979; however, the trial court permitted the jury to consider, in rebuttal of the (f)(1) mitigating circumstance, the defendant's convictions on nine counts of indecent liberties and indecent exposure that occurred in 1986, seven years after the murder. In *Coffey*, the State "emphasized defendant's pedophilia, and history of sexual abuse of children, in closing arguments when it repeatedly referred to the defendant as a 'child molester.' " *Id.* at 422, 444 S.E.2d at 437. We concluded that evidence of the defendant's 1986 convictions was "extremely prejudicial" and was inadmissible either to rebut the (f)(1) mitigating circumstance or to explore the bases of the opinions of the defendant's expert witnesses. *Id.*

In this case, we first note that while defendant's conviction of felony larceny was improperly admitted during the sentencing proceeding, evidence of defendant's theft of Dewayne Conner's truck was already properly before the jury, having been presented during the guilt phase of the trial. Further, the evidence of defendant's larceny conviction was not of the same highly prejudicial nature as the improper evidence allowed in *Coffey*. Additionally, the jury in this case had before it extensive evidence of defendant's drug activity. The prosecutor sought to show during the trial that defendant's drug activity was an important factor leading to the murder, and she emphasized this in closing arguments:

Now, the first proposed mitigating [sic] is that the defendant has no significant history of prior criminal activity. Now, the word significant is very important in that sentence. You've only had evidence of 2 prior convictions.

The defendant stole the tractor and the defendant stole the truck. You might say well, that's not all that significant. Then you will also note that this circumstance says criminal activity, not criminal convictions.

And you've heard evidence that this defendant was a crack user, cocaine user, marijuana user, and that not only that, but he provided cocaine and marijuana to 2 15-year old girls.

So I argue to you that you cannot find that that is not a significant history of prior criminal activity. I argue to you that you should vote no, each and every one of you, to that first proposed mitigating circumstance because his prior criminal activity is significant. It's significant in that it led us to this point.

For the foregoing reasons, we conclude that the trial court's errors on this issue do not require a new sentencing proceeding.

[11] Defendant next assigns error to the trial court's overruling of his objection to the prosecutor's biblical argument during closing arguments of the capital sentencing proceeding. The argument went as follows:

> From the Old Testament and the Book of Numbers anyone who kills a person is to be put to death as a murderer upon the testimony of witnesses.
>
> [DEFENSE COUNSEL]: Objection, your Honor.
>
> [PROSECUTOR]: That's what we've done in this case, ladies and gentlemen.
>
> [COURT]: Overruled.
>
> [PROSECUTOR]: You've heard the testimony of witnesses. You have convicted this man and rightly so, of murder in the first degree. The death penalty is here. Now, they might argue to you the New Testament changes all that. No, it doesn't. Jesus didn't come to destroy the law or the prophesies of the Old Testament. He came to fulfill them.
>
> Listen to this in Deuteronomy. Cursed is the man who kills his neighbor secretly and all the people shall say amen. Cursed is the man who kills an innocent person for money, and all the people shall say amen. It's time to sentence this man, a murderer, to die and let the people of Bertie County say amen. Thank you.

Defendant contends that this argument was improper on several grounds. First, because the prosecutor invoked a biblical reference specifically as to the people of Bertie County, it made the death penalty *in this case* appear to be ordained by the Bible. Second, allowing such a religious-based argument violates the separation of church and state. Third, it is constitutionally impermissible to relieve the jury of its responsibility for deciding defendant's sentence by arguing that the death penalty is divinely inspired. Finally, the religious argument injects an arbitrary and inflammatory element into the capital sentencing decision because the Bible is not relevant to the facts or law of this case.

We begin by repeating our recent warning to counsel

> that they should base their jury arguments solely upon the secular law and the facts. Jury arguments based on any of the religions of the world inevitably pose a danger of distracting the jury from its sole and exclusive duty of applying secular law and unnecessarily risk reversal of otherwise error-free trials.

*State v. Williams*, 350 N.C. 1, 27, 510 S.E.2d 626, 643, *cert. denied*, —— U.S. ——, 145 L. Ed. 2d 162, 68 U.S.L.W. 3228 (1999).

However, we also note that " 'more often than not,' we have concluded that such biblical arguments are within permissible margins given counsel in arguing 'hotly contested cases.' " *State v. Bond*, 345 N.C. 1, 36, 478 S.E.2d 163, 182 (1996), *cert. denied*, 521 U.S. 1124, 138 L. Ed. 2d 1022 (1997); *see also State v. Holden*, 346 N.C. 404, 433, 488 S.E.2d 514, 530 (1997), *cert. denied*, 522 U.S. 1126, 140 L. Ed. 2d 132 (1998). We conclude that such is the case here and that the trial court did not err in overruling defendant's objection to the first part of the above argument or in failing to intervene *ex mero motu* as to the remainder.

The first part of the prosecutor's argument, to which defendant objected, emphasized "the testimony of witnesses" and sought to remind the jury that it had heard testimony from witnesses supporting its verdict of guilty. This is not the type of argument that we have in the past found to be an "improper use of religious sentiment." *State v. Ingle*, 336 N.C. 617, 648, 445 S.E.2d 880, 896 (1994) (citing *State v. Moose*, 310 N.C. 482, 313 S.E.2d 507 (1984) (disapproving argument that the power of public officials is ordained by God), and *State v. Oliver*, 309 N.C. 326, 307 S.E.2d 304 (1983) (noting the impropriety of arguing that the death penalty is divinely inspired)), *cert. denied*, 514 U.S. 1020, 131 L. Ed. 2d 222 (1995). Further, immediately preceding the challenged argument, the prosecutor clearly referred to the secular laws of North Carolina, telling the jury, "[t]he State has proven to you what is required by law for the imposition of the death penalty in this case." *See Bond*, 345 N.C. at 36-37, 478 S.E.2d at 182; *State v. Walls*, 342 N.C. 1, 61, 463 S.E.2d 738, 770 (1995), *cert. denied*, 517 U.S. 1197, 134 L. Ed. 2d 794 (1996).

[12] As to the remainder of the prosecutor's argument, defendant did not object at trial. Again, the prosecutor did not say that the law of North Carolina is divinely inspired or that law officers are ordained by God. *Walls*, 342 N.C. at 61, 463 S.E.2d at 770; *see also Davis*, 349 N.C. at 47, 506 S.E.2d at 480. Defendant particularly complains that the prosecutor's argument "takes the Biblical mandate and applies it

to Bertie County, making it appear that the death penalty *in this case* is ordained by the Good Book." We disagree. The prosecutor said, "and let the people of Bertie County say amen." This falls within the permissible practice of "urg[ing] the jury to act as the voice and conscience of the community." *State v. Peterson*, 350 N.C. 518, 531, 516 S.E.2d 131, 139 (1999). Thus, while we do not approve of the prosecutor's use of biblical references in the closing arguments of this sentencing proceeding, we do not find the argument to be so grossly improper that the trial court erred by failing to intervene *ex mero motu*. This assignment of error is rejected.

**[13]** Defendant's next assignment of error also concerns the prosecutor's closing arguments at sentencing. Defendant contends that the trial court erred in allowing the prosecutor, over objection, to address the jurors by name and inform them that it was time for them to impose the death penalty, citing *State v. Holden*, 321 N.C. 125, 362 S.E.2d 513 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). In *Holden*, this Court found no error where the trial court sustained the State's objection to the defense counsel's attempt to ask each juror individually to spare the defendant's life. We held that the argument "was improper in that it asked each individual juror to decide defendant's fate on an emotional basis, in disregard of the statutorily prescribed procedure of N.C.G.S. § 15A-2000, and in disregard of the jurors' duty to deliberate with the entire jury toward the end of reaching a unanimous verdict." *Id.* at 163, 362 S.E.2d 537.

In this case, the prosecutor reminded the jurors that, during *voir dire*, each had answered "yes" when asked whether he or she could return a sentence of death "[i]f the State proves to you what is required by law for the imposition of the death penalty." The prosecutor then called out the jurors' names and said, "The State has proven to you what is required by law for the imposition of the death penalty in this case. The time has come for you to impose the sentence of death in this case."

The basis for the Court's decision in *Holden* was that the defendant's argument attempted to persuade jurors to decide the defendant's sentence "on an emotional basis, in disregard of the statutorily prescribed procedure . . . and in disregard of the jurors' duty to deliberate." *Id.* In the instant case, the State's argument merely sought to remind the jurors that they had affirmed that they could follow the law if the State proved what was required to impose the death penalty. This case is similar to *State v. Wynne*, in which we held that

the rule of *Holden* was not violated where the prosecutor, in closing arguments, called the jurors by name and asked them to "have no doubt." 329 N.C. 507, 525, 406 S.E.2d 812, 821 (1991). This assignment of error is rejected.

**[14]** By two assignments of error, defendant next contends that the trial court erred by failing to intervene *ex mero motu* to prevent the prosecutor from commenting on defendant's exercise of his right to remain silent. During the closing arguments of the sentencing proceeding, the prosecutor stated that defendant had not acknowledged wrongdoing and asked the jurors if they had heard defendant apologize or express sorrow or remorse. This Court has previously held that similar statements do not constitute an impermissible comment on a defendant's absolute right to remain silent. *See, e.g., State v. McNatt*, 342 N.C. 173, 175-76, 463 S.E.2d 76, 77-78 (1995); *State v. Hill*, 311 N.C. 465, 474-75, 319 S.E.2d 163, 169 (1984). We reject this assignment of error.

**[15]** By another assignment of error, defendant claims that the trial court erred and violated N.C.G.S. § 15A-2000 and the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution when it denied defendant's request for a peremptory instruction on the nonstatutory mitigating circumstance of "[t]he defendant having found a closer path to the Lord." In support of this mitigating circumstance, defendant presented the testimony of Richard Hayes, a pastor who visited defendant in jail. Hayes and defendant prayed together and read and discussed scriptures and salvation.

A defendant is entitled to a peremptory instruction when a mitigating circumstance is supported by uncontroverted evidence. *See State v. White*, 349 N.C. 535, 568, 508 S.E.2d 253, 274 (1998), *cert. denied*, —— U.S. ——, 144 L. Ed. 2d 779 (1999); *State v. Bonnett*, 348 N.C. 417, 446, 502 S.E.2d 563, 582 (1998), *cert. denied*, 525 U.S. 1124, 142 L. Ed. 2d 907 (1999). Reverend Hayes testified, "I believe that [defendant] is seeking a closer walk with the Lord, and I hope he's finding that." During the charge conference, the prosecutor argued that "[t]here is testimony that the reverend has an opinion on that [mitigating circumstance], but there is no evidence as to what the defendant has really discovered," and the trial court declined to give a peremptory instruction. We conclude that while Reverend Hayes' testimony could support the jury's finding the mitigating circumstance, it is not uncontroverted evidence that defendant had "found" a closer path to the Lord. The trial court did not err in failing to give

a peremptory instruction as to this mitigating circumstance, and this assignment of error is rejected.

Defendant next asserts that the trial court erred and violated N.C.G.S. § 15A-1340.16 when it aggravated defendant's armed robbery sentence by finding that defendant was armed with a deadly weapon at the time of the offense. The State argues that the trial court did not in fact find the use of a deadly weapon as an aggravating factor in sentencing defendant for armed robbery. We agree. The transcript fully supports the State's position; it clearly indicates that the trial court did not—and recognized that it could not—find this aggravating factor in sentencing defendant for the armed robbery conviction. The fact that box number 10 on the "Felony Judgment Findings of Aggravating and Mitigating Factors" form was checked is an obvious clerical error because it is inconsistent with the trial court's actual findings. Defendant is not entitled to a new sentencing hearing on the armed robbery conviction.

[16]  In his next assignment of error, defendant contends that the trial court erred in its instructions on Issues Three and Four of the sentencing instructions. Defendant argues that the trial court instructed the jury in contradictory terms, at one point telling jurors that they "must" consider mitigating circumstances in deciding Issue Three and then that they "may" consider found mitigating circumstances in Issue Four. Defendant contends that the two different treatments of the mitigating circumstances were confusing, leading to an unreliable and unguided jury decision. We disagree.

Because defendant did not object at trial, this issue is reviewed for plain error. *See State v. Adams*, 347 N.C. 48, 69, 490 S.E.2d 220, 231 (1997), *cert. denied*, 522 U.S. 1096, 139 L. Ed. 2d 878 (1998); *State v. Jones*, 342 N.C. 523, 541, 467 S.E.2d 12, 23 (1996). "In order to rise to the level of plain error, the error in the trial court's instructions must be so fundamental that (i) absent the error, the jury probably would have reached a different verdict; or (ii) the error would constitute a miscarriage of justice if not corrected." *State v. King*, 342 N.C. 357, 365, 464 S.E.2d 288, 293 (1995).

The instructions of which defendant now complains are as follows:

Now, please look at Issue Number 3 on your form. That issue reads do you unanimously find beyond a reasonable doubt that the mitigating circumstance or circumstances found is, or are,

insufficient to outweigh the aggravating circumstance or circumstances *found by you?*

If you find from the evidence one or more mitigating circumstances, you must weigh the aggravating circumstance found by you against the mitigating circumstances when deciding this issue.

When you decide this issue, each juror *must* consider any mitigating circumstance or circumstances that the juror determined to exist by a preponderance of the evidence in Issue 2. In so doing, you are the sole judges of the weight to be given any individual circumstance which you find, whether it be aggravating or mitigating.

. . . .

If you answer Number 3, yes, you must consider then Issue Number 4. Look at it on your form. It reads do you unanimously find beyond a reasonable doubt that the aggravating circumstance you found is sufficiently substantial to call for the imposition of the death penalty when considered with the mitigating circumstance or circumstances found by one or more of you?

Now, in deciding this issue, you are not to consider the aggravating circumstance standing alone. You must consider it in connection with any mitigating circumstances found by one or more of you. When you make this comparison, every juror *may* consider any mitigating circumstance or circumstances that juror determined *to exist by a preponderance of the evidence.*

(Emphasis added.)

We do not accept defendant's contention that the use of the word "must" in the instruction on Issue Three and the word "may" in the instruction on Issue Four confused the jury or created a contradiction in the instructions leaving the jury unguided in determining defendant's sentence. The above-quoted instructions given by the trial court in this case are virtually identical to the pattern capital sentencing instructions. *See* N.C.P.I.—Crim. 150.10 (1998). As this Court said in *State v. Lee,* approving the pattern instructions:

The rule of *McKoy [v. North Carolina,* 494 U.S. 433, 108 L. Ed. 2d 369 (1990),] is that jurors may not be prevented from considering mitigating circumstances which they found to exist

in Issue Two. Far from precluding a juror's consideration of mitigating circumstances he or she may have found, the instant instruction expressly instructs that the evidence in mitigation *must* be weighed against the evidence in aggravation.

335 N.C. at 287, 439 S.E.2d at 569-70.

The trial court's instructions in this case were nearly identical to the jury instructions approved in *State v. Lee* and in numerous other cases. *See, e.g., Gregory*, 340 N.C. at 417-18, 459 S.E.2d at 668; *State v. Conaway*, 339 N.C. 487, 532-33, 453 S.E.2d 824, 852-53, *cert. denied*, 516 U.S. 884, 133 L. Ed. 2d 153 (1995). Most important, the instructions in this case did not preclude a juror from considering mitigating circumstances he or she may have found, and they instructed that the evidence in mitigation must be weighed against the evidence in aggravation. *See Lee*, 335 N.C. at 287, 439 S.E.2d at 570. We find no error, plain or otherwise.

Also under this assignment of error, defendant raises the claim, repeatedly rejected by this Court, that use of the word "may" in the trial court's instructions on sentencing Issue Four was error. We decline to depart from our prior decisions on this issue. *See, e.g., State v. McNeill*, 349 N.C. 634, 653, 509 S.E.2d 415, 426 (1998), *cert. denied*, —— U.S.——, 145 L. Ed. 2d 87, 68 U.S.L.W. 3225 (1999).

[17] By another assignment of error, defendant challenges the trial court's denial of his motion to bar the request for or imposition of the death penalty. Defendant acknowledges that this Court has consistently upheld the constitutionality of North Carolina's death penalty statute, N.C.G.S. § 15A-2000. *See, e.g., Williams*, 350 N.C. at 35, 510 S.E.2d at 648; *State v. Stephens*, 347 N.C. 352, 368, 493 S.E.2d 435, 445 (1997), *cert. denied*, 525 U.S. 831, 142 L. Ed. 2d 66 (1998). Defendant, however, requests that this Court reconsider its previous decisions upholding the death penalty, citing Justice Blackmun's dissent in *Callins v. Collins*, 510 U.S. 1141, 1143, 127 L. Ed. 2d 435, 436 (1994) (Blackmun, J., dissenting). We have considered this argument before, and defendant presents no new compelling reason for this Court to change its position. *See Williams*, 350 N.C. at 36, 510 S.E.2d at 648. Additionally, defendant contends that the death penalty is unconstitutional as applied to defendant in this case because "defendant's sentencing procedure did not conform to N.C.G.S. [§] 15A-2000." We disagree, having found no reversible error in defendant's capital sentencing proceeding. This assignment of error is rejected.

Defendant raises eight additional issues that he concedes have been previously decided adversely to his position. Defendant raises the following issues for purposes of requesting that this Court reconsider its prior holdings and to preserve the issues for subsequent review: (1) whether the trial court erred by denying defendant's motion to preclude the prosecution from using peremptory challenges to strike jurors who indicated uncertainty about the death penalty, (2) whether the trial court erred by denying defendant's motion for individual jury *voir dire*, (3) whether the trial court's instruction that all evidence in both phases of the trial was competent for the jurors' consideration violated defendant's constitutional rights, (4) whether the trial court erred in submitting the aggravating circumstance that the murder was committed by defendant while engaged in the commission of robbery with a firearm, (5) whether the trial court erred in denying defendant's motion for additional peremptory challenges, (6) whether the trial court erred in denying defendant's motion to prohibit death-qualification of the jury, (7) whether the trial court erred in instructing the jurors that they must consider whether the nonstatutory mitigating circumstances have mitigating value and may reject those that do not, and (8) whether the trial court's use of the terms "satisfaction" and "satisfy" in instructions defining the burden of proof applicable to mitigating circumstances was plain error. After carefully considering defendant's arguments on these issues, we find no compelling reason to depart from our prior holdings.

Having concluded that defendant's trial and separate capital sentencing proceeding were free of prejudicial error, we turn to the duties reserved exclusively for this Court in capital cases. It is our duty under N.C.G.S. § 15A-2000(d)(2) to ascertain: (1) whether the record supports the jury's finding of the aggravating circumstance on which the sentence of death was based; (2) whether the death sentence was entered under the influence of passion, prejudice, or other arbitrary consideration; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

In this case, the sole aggravating circumstance submitted to and found by the jury was that the murder was committed by defendant while defendant was engaged in the commission of robbery with a firearm, N.C.G.S. § 15A-2000(e)(5). After thoroughly examining the record, transcripts, and briefs in this case, we conclude that the jury's finding of the (e)(5) aggravating circumstance was fully supported by

evidence presented at defendant's trial. Further, there is no indication that the sentence of death in this case was imposed under the influence of passion, prejudice, or any other arbitrary consideration. We now turn to our final statutory duty of proportionality review.

[18] We begin our proportionality review by comparing the present case with other cases in which this Court has concluded that the death penalty was disproportionate. *State v. McCollum*, 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994). We have found the death penalty disproportionate in seven cases. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163; *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

We conclude that this case is not substantially similar to any case in which this Court has found the death penalty disproportionate. We note several features of this case that distinguish it from the cases in which we have found the death sentence to be disproportionate. First, it is significant that the jury found defendant guilty of first-degree murder under the theories of malice, premeditation, and deliberation; lying in wait; and felony murder. We have said that "[t]he finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *State v. Artis*, 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990). "A defendant's lying in wait to commit murder has also been recognized by this Court as a significant consideration in proportionality review." *State v. LeGrande*, 346 N.C. 718, 730, 487 S.E.2d 727, 733 (1997). Additionally, the victim was shot twice at close range in his own home. This Court has emphasized that a murder committed in the home particularly "shocks the conscience, not only because a life was senselessly taken, but because it was taken by the surreptitious invasion of an especially private place, one in which a person has a right to feel secure." *State v. Brown*, 320 N.C. 179, 231, 358 S.E.2d 1, 34, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987), *quoted in Adams*, 347 N.C. at 77, 490 S.E.2d at 236. In this case, defendant engaged in a conspiracy with two young girls to commit the armed robbery and murder, relying on the victim's familiarity

STATE ex rel. UTILS. COMM'N v. CAROLINA UTIL. CUSTOMERS ASS'N

[351 N.C. 223 (2000)]

with and trust of the girls to gain access to the victim's home. Finally, although the jury considered a total of twenty-four statutory and non-statutory mitigating circumstances, only two were found by at least one juror to exist and to have mitigating value: the (f)(9) catchall mitigating circumstance, unspecified; and the nonstatutory mitigating circumstance that defendant had a substance abuse problem at the time of the incident.

It is also proper to compare this case to those where the death sentence was found proportionate. *McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. However, it is unnecessary to cite every case used for comparison. *Id.*; *State v. Syriani*, 333 N.C. 350, 400, 428 S.E.2d 118, 146, *cert. denied*, 510 U.S. 948, 126 L. Ed. 2d 341 (1993). Whether the death penalty is disproportionate "in a particular case ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 47, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994).

We cannot conclude, after comparing this case to other roughly similar cases in which the death penalty was imposed and considering both the crime and defendant, that the death penalty was disproportionate or excessive as a matter of law. Accordingly, the judgments of the trial court must be and are left undisturbed.

NO ERROR.