An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA13-1384

NORTH CAROLINA COURT OF APPEALS

Filed:  16 September 2014

STATE OF NORTH CAROLINA

v.

Brunswick County
Nos. 08 CRS 52588, 3040, 11 CRS 1781

CREIG WIAND BRYANT

Appeal by defendant from judgments entered 17 September 2012 by Judge Thomas H. Lock in Brunswick County Superior Court. Heard in the Court of Appeals 8 May 2014.

> *Attorney General Roy Cooper, by Special Deputy Attorney General Jonathan P. Babb, for the State.*

> *Appellate Defender Staples Hughes, by Assistant Appellate Defender Paul M. Green, for Defendant.*

ERVIN, Judge.

Defendant Creig Wiand Bryant appeals from judgments sentencing him to consecutive terms of imprisonment based upon his convictions for robbery with a  dangerous weapon, conspiracy to commit murder, and first degree murder.  On appeal, Defendant argues that the trial court erred by refusing to admit certain evidence on hearsay-related grounds and to allow Defendant to have access to certain documents.  In addition, Defendant argues that we should either grant the motion for appropriate relief

that he has filed on appeal or remand this case to the trial court for an evidentiary hearing. After careful consideration of Defendant's challenges to the trial court's judgments in light of the record and the applicable law, we conclude that the trial court's judgments should remain undisturbed.

## I. Factual Background

## A. Substantive Facts

## 1. State's Evidence

On 30 May 2007, Delphia and Howard Bryant sold three acres of real property located at 1820 Stone Chimney Road in Supply to Defendant. Subsequently, Defendant, who owned a rifle with a scope, developed financial problems, having borrowed money from a "loan shark" in order to purchase a tractor-trailer truck.

After incurring that indebtedness, Defendant expressed an interest in selling the Stone Chimney Road property to Adam Bradshaw in order to obtain money to repay the "loan sharks," who were pressing him for payment. According to the proposed arrangement between Defendant and Mr. Bradshaw, Mr. Bradshaw would, after obtaining title, refrain from selling the property; allow Defendant to repay the purchase price, with interest; and return title to the property to Defendant at the completion of the repayment process.

Mr. Bradshaw worked as a real estate broker for Century 21 and was known for driving a royal blue Mustang convertible. Mr. Bradshaw's Mustang bore a license plate reading "C21King" and a magnetic sign to which his name, telephone number, and the words "Century 21" had been affixed. Prior to reaching final agreement concerning the proposed transaction with Defendant, Mr. Bradshaw informed Robert Schomp, a co-worker and real estate broker, that Defendant was seeking to sell the Stone Chimney Road property quickly and that it could be purchased "dirt cheap." Although Mr. Schomp was told that the purchase price for the Stone Chimney Road property would be $29,000, he declined to become involved in the proposed transaction out of "great concern" stemming from the fact that the purchase price was well below market value.

On 5 December 2007, Mr. Bradshaw purchased the Stone Chimney Road property from Defendant. H. Mac Tyson, II, who had an office across from Mr. Bradshaw's, handled the transaction for Defendant and Mr. Bradshaw. According to the agreement between the parties, Defendant was to receive a sales price of $22,500 and use the proceeds from the sale of the Stone Chimney Road property to provide a down payment in connection with the purchase of a separate tract of land. In addition, the parties agreed that Defendant had the right to repurchase the property

from Mr. Bradshaw for $17,500 if the related option was exercised prior to midnight on 5 June 2008. The agreement between the parties specifically stated that the sales price was "well below [the] tax value" given Defendant's need to make a "quick cash sale."

After purchasing the Stone Chimney Road property, Mr. Bradshaw attempted to sell it. However, Mr. Bradshaw had trouble selling the property. Mr. Bradshaw's efforts to sell the property were hampered by a number of factors, including the repeated theft of the "for sale" signs posted on the property. Although Defendant was initially pleased by his arrangement with Mr. Bradshaw, he became dissatisfied upon learning that Mr. Bradshaw had put the property on the market since he had agreed to pay Mr. Bradshaw $1,500 bi-monthly as part of his effort to repurchase the property.

Defendant's entire family was upset by the fact that Defendant had lost ownership of the property.[1] Defendant was so upset that he began stalking Mr. Bradshaw and told Lora Moultrie, his girlfriend, that he was "going to kill the MF" and enlisted her help to do so. As part of that process, Ms.

---

[1]Howard and Delphia Bryant recorded a statement in the office of the Brunswick County Register of Deeds on 31 January 2008, stating that the Stone Chimney Road property was not to be sold but rather was to be transferred through the family down the generations.

Moultrie persuaded Robert Stanley to notarize a quitclaim deed transferring the property from Mr. Bradshaw to Defendant, an act that was effectuated without either party being present. This deed was recorded on 1 February 2008.

Ms. Moultrie called Mr. Bradshaw on 16 April 2008 to discuss selling an abandoned green home owned by her sister located on Watts Road. Although Ms. Moultrie planned to meet with Mr. Bradshaw on 24 April 2008 for the purpose of viewing the property, Mr. Bradshaw canceled their appointment due to illness. Subsequently, Ms. Moultrie called Mr. Bradshaw at approximately 4:00 p.m. on 26 April 2008 for the purpose of arranging a meeting with Mr. Bradshaw at the Watts Road home. However, Ms. Moultrie did not plan to attend this meeting given that it had been arranged to get Mr. Bradshaw to come to the Watts Road home so that Defendant could kill him.

On 26 April 2008, Defendant drove a white pickup truck to the residence of Christy Hughes, where he picked Ms. Hughes up. At that time, Defendant told Ms. Hughes that he needed to go somewhere to meet a friend. After Defendant and Ms. Hughes arrived at the Watts Road property, Defendant gave Ms. Hughes the keys to his truck and his telephone, told her to leave the area, and informed her that he would notify her when it was time for her to return and pick him up. Before leaving the Watts

Road property, Ms. Hughes overheard Defendant speaking to Ms. Moultrie on the phone for the purpose of asking when "he" was going to show up.

Subsequently, Defendant called Ms. Moultrie to tell her that Mr. Bradshaw had not arrived. As a result, Ms. Moultrie called Mr. Bradshaw to find out why he had not kept the scheduled appointment. During that conversation, Mr. Bradshaw stated that, while he was going to be a little late, he still intended to come to the Watts Road property. In light of that fact, Ms. Moultrie called Defendant at 4:59 p.m. for the purpose of informing him that Mr. Bradshaw was on his way.

As he traveled to Watts Road, Mr. Bradshaw spoke with Mr. Schomp, who had called him at 5:11 p.m. after noticing that Mr. Bradshaw was driving on Four Mile Road. During that conversation, Mr. Bradshaw told Mr. Schomp that he had an appointment on Watts Road. A number of other individuals saw Mr. Bradshaw signaling for a turn from Four Mile Road onto Watts Road or having parked his vehicle close to the Moultrie home on Watts Road.

At least two hours after Ms. Hughes left him at the Watts Road property, Defendant called Ms. Hughes and asked her to pick him from a different location. After being retrieved by Ms. Hughes, Defendant returned home to Ms. Moultrie, where he told

her that he had killed Mr. Bradshaw. According to Defendant, he went to the home of a man that Ms. Moutrie did not know named Chuck, could not get a clean view of Mr. Bradshaw through the scope of his rifle given that Mr. Bradshaw would not stay still, and that Chuck had shot Mr. Bradshaw in the back of the head. At that point, Defendant told Ms. Moultrie that he and Chuck had dragged Mr. Bradshaw's body to the end of the road and covered it with leaves and straw.

Subsequently, Defendant and Ms. Moultrie went to the Watts Road property, where Ms. Moultrie observed Defendant retrieving a gun bag from a wooded area. After their visit to the Watts Road area, Defendant and Ms. Moultrie went to South Carolina, where they purchased gas using a credit card that belonged to the Bradshaw family.

Mr. Bradshaw and his family were supposed to host his father-in-law and his family for dinner at around 4:45 p.m. on 26 April 2008. Although everyone else had finished dinner by approximately 7:00 p.m., Mr. Bradshaw's wife became concerned because Mr. Bradshaw had failed to come to the planned dinner, refrained from answering her telephone calls, and did not come home at all that night. As a result of the fact that no one had heard anything from Mr. Bradshaw by the following day, his family contacted the police and filed a missing person's report.

On 29 April 2008, investigating officers went to Watts Road after determining that Mr. Bradshaw had been in that area on the last occasion when anyone had seen him. As the investigating officers drove down Watts Road, they smelled a pungent odor. After noticing a pile of debris that appeared to be able to contain a body, the investigating officers saw a shoe in front of the debris pile and feet protruding from the rear. Upon further examination of the debris pile, investigating officers found Mr. Bradshaw's body. A subsequent autopsy established that Mr. Bradshaw died from a gunshot wound to the back of his head that was probably inflicted by a high-powered rifle bullet.

On 1 May 2008, investigating officers went to the abandoned home on Watts Road, where they found a pool of blood, what appeared to be fragments of a human skull, and Defendant's DNA on hairs recovered from a mattress next to a broken window. Ms. Moultrie eventually led the investigating officers to a location at which they discovered Mr. Bradshaw's car.

On 8 May 2008, Athakus Bryant brought a slug gun with a mounted scope to the investigating officers. According to Athakus Bryant, Defendant had brought the slug gun to his residence at or about the time that Mr. Bradshaw was murdered with a request that Athakus Bryant hold the slug gun for a

period of time.  A few days later, Defendant returned and showed Athakus Bryant a rifle with a scope.

## 2. Defense Evidence

Mr. Bradshaw had been seen in Longwood, an area that was known to have drug-related problems.  Mr. Bradshaw smoked cocaine with and purchased cocaine from Patrick Taylor and Tamara Kelly.  On the Friday before his disappearance, Mr. Bradshaw purchased cocaine and headed toward Tamara Kelly's residence.  A witness saw Mr. Taylor and Ms. Kelly driving a blue Mustang after Mr. Bradshaw's disappearance had become public knowledge.  As a result of the fact that numerous blue Mustangs had been seen in the area, the witness could do no more than say that he thought, but could not confirm, that the vehicle in which Mr. Taylor and Ms. Kelly were driving after Mr. Bradshaw's disappearance had signage referencing Century 21 on the front bumper.  A second witness saw Mr. Taylor and Ms. Kelly in Mr. Bradshaw's Mustang on either the Sunday or the Monday after Mr. Bradshaw's disappearance and indicated that it was not unusual to see different people driving Mr. Bradshaw's car. Another witness testified that, at approximately 8:30 p.m. on the Saturday prior to the date upon which Mr. Bradshaw's body was discovered, he saw Mr. Taylor and Ms. Kelly in Mr. Bradshaw's vehicle.  Finally, after the date of Mr. Bradshaw's

disappearance and before the date upon which news coverage concerning Mr. Bradshaw's death began to appear, a member of the Crips gang named Richard Antwan Brown appeared at his cousin's residence. Although Mr. Brown usually had a neat and clean appearance and dressed well, he was excited, in a disheveled condition, had blood on his left sock, and emitted a foul odor.

## B. Procedural Facts

On 1 May 2008, a warrant for arrest charging Defendant with murder was issued. On 2 June 2008, the Brunswick County grand jury returned bills of indictment charging Defendant with first degree murder and conspiracy to commit murder. On 18 April 2011, the Brunswick County grand jury returned a bill of indictment charging Defendant with robbery with a dangerous weapon. The charges against Defendant came on for trial at the 20 August 2012 criminal session of the Brunswick County Superior Court. On 17 September 2012, the jury returned verdicts convicting Defendant as charged. At the conclusion of the ensuing sentencing hearing, the trial court entered judgments sentencing Defendant to a term of life imprisonment without the possibility of parole based upon his conviction for first degree murder, to a consecutive term of 180 to 225 months imprisonment based upon his conviction for conspiracy to commit murder, and to a consecutive term of 72 to 96 months imprisonment based upon

his conviction for robbery with a firearm.  Defendant noted an appeal to this Court from the trial court's judgments.

## II. Legal Analysis

### A. Evidentiary Issues

### 1. Standard of Review

The admissibility of alleged hearsay evidence is a question of law reviewable using a *de novo* standard of review.  *State v. McLean*, 205 N.C. App. 247, 249, 695 S.E.2d 813, 815 (2010). Under a *de novo* standard of review, this Court "considers the matter anew and freely substitutes its own judgment" for that of the trial court.  *State v. Williams*, 362 N.C. 628, 632-33, 669 S.E.2d 290, 294 (2008).  "A defendant is prejudiced by errors relating to rights arising other than under the Constitution of the United States when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises."  N.C. Gen. Stat. § 15A-1443(a).[2]

### 2. Specific Evidentiary Issues

### a. Mr. Brown's Question

[2]Although Defendant argues that the challenged evidentiary rulings violated his federal and state constitutional rights, that set of contentions is not properly before us given that Defendant failed to advance these constitutional arguments before the trial court. *State v. Hunter*, 305 N.C. 106, 112, 286 S.E.2d 535, 539 (1982) (stating that "a constitutional question which is not raised and passed upon in the trial court will not ordinarily be considered on appeal").

In his first challenge to the trial court's judgments, Defendant contends that the trial court erred by excluding certain testimony on hearsay grounds. More specifically, Defendant argues that the trial court should have allowed the admission of evidence to the effect that Ms. Moultrie's cousin, Mr. Brown, had asked his cousin, Shamus Bland, if he had heard anything about a murder. Defendant is not entitled to relief on the basis of this contention.

According to N.C. Gen. Stat. § 8C-1, Rule 801(c), hearsay consists of "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." A "statement," for hearsay-related purposes, is defined as an "oral or written assertion." N.C. Gen. Stat. § 8C-1, Rule 801(a). "Out-of-court statements offered for purposes other than to prove the truth of the matter asserted are not considered hearsay." *State v. Golphin*, 352 N.C. 364, 440, 533 S.E.2d 168, 219 (2000) (citation omitted), *cert denied*, 532 U.S. 931, 121 S. Ct. 1379, 149 L. Ed. 2d 305 (2001).

Although the State argues that, while the excluded comment took "the form of a question," it was, in actuality, "an implied assertion," the challenged evidence was nothing more or less than an inquiry concerning the extent to which the other party

to a conversation had heard about a murder. Instead of using this statement for the truth of the matter asserted, Defendant sought the admission of Mr. Brown's question for the purpose of showing that it had been made and arguing that the posing of the question implied that Mr. Brown had had some involvement in the commission of Mr. Bradshaw's murder. However, although the exclusion of the challenged evidence was error, we are unable to see that "there is a reasonable possibility that . . . a different result would have been reached at the trial," N.C. Gen. Stat. § 15A-1443(a), in the event that the trial court had allowed the admission of the evidence in question. Simply put, the excluded evidence consisted of a vague comment that did not identify the murder in question, contained no admission of culpability, and provided no indication that Defendant was not involved in the death of Mr. Bradshaw. As a result, given the limited probative value of the excluded evidence and the strength of the State's case against Defendant, we conclude that the trial court's decision to exclude the challenged evidence, while erroneous, did not prejudice Defendant's chances for a more favorable outcome at trial.

### b. Eric Bryant's Statements

Secondly, Defendant argues that the trial court erred by excluding evidence concerning statements made by his brother,

Eric Bryant, in which, according to Defendant, Eric Bryant implicated himself in Mr. Bradshaw's murder. More specifically, Defendant contends that the trial court should have allowed him to elicit evidence during his cross-examination of Special Agent Kelly Oaks of the State Bureau of Investigation concerning statements that Ms. Moultrie told Special Agent Oaks that Eric Bryant made to her. Defendant's argument lacks merit.

At trial, Defendant sought to introduce notes made by Special Agent Oaks concerning statements made by Ms. Moultrie during a polygraph examination. During that interview, Ms. Moultrie stated that Eric Bryant had said that he had "handled [his] business" and had to "get the f*** out of here," that Eric Bryant had "overheard me talking to my sister about meeting [Mr.] Bradshaw over at her house," and that Mr. Bradshaw had "screwed [the] family out of money [and] he was mad about it." According to Defendant, the trial court should have allowed the admission of these statements on the grounds that these statements were inconsistent with Ms. Moultrie's trial testimony; within the confines of the hearsay exceptions for excited utterances, statement of a then-existing mental or emotional condition, and statements against interest; or not hearsay at all.

The evidence that Defendant sought to elicit concerning Eric Bryant's statements consisted of Ms. Moultrie's statements to Special Agent Oaks concerning statements that Eric Bryant made to her. In view of Defendant's contention that these statements tended to exculpate Defendant and inculpate Eric Bryant, it is clear that Defendant sought to use most, if not all, of Eric Bryant's statements for the truth of the matter asserted. As a result, in order to obtain the admission of these statements, Defendant was required to show that "each part of the combined statements conforms to an exception to the hearsay rule." N.C. Gen. Stat. § 8C-1, Rule 805.

Aside from the fact that Defendant has not, in his brief, explained how the statements that Ms. Moultrie made to Special Agent Oaks contradicted Ms. Moultrie's trial testimony,[3] we are not, for the most part, satisfied that the statements attributed to Eric Bryant either failed to constitute hearsay or fell within the scope of any applicable hearsay exception. For example, Defendant has not explained how any portion of Eric Bryant's statements, as recounted by Ms. Moultrie, constituted "[a] statement describing or explaining an event or condition

---

[3]In view of Defendant's admission that Ms. Moultrie did not testify concerning the extent to which Eric Bryant overheard her conversation with her sister about meeting Mr. Bradshaw in her trial testimony, we are unable to see how the portion of Ms. Moultrie's testimony concerning that subject would be relevant for impeachment-related purposes.

made while the declarant was perceiving the event or condition, or immediately thereafter." N.C. Gen. Stat. § 8C-1, Rule 803(1). Similarly, Defendant has failed to explain how any portion of Eric Bryant's statements "relat[ed] to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." N.C. Gen. Stat. § 8C-1, Rule 803(2). Finally, while "[a] statement tending to expose the declarant to criminal liability is . . . admissible in a criminal case [if] corroborating circumstances clearly indicate the trustworthiness of the statement," N.C. Gen. Stat. § 8C-1, Rule 804(b)(3), Defendant has failed to demonstrate the existence of the required "corroborating circumstances." *See, e.g.*, *State v. Pickens*, 346 N.C. 628, 642, 488 S.E.2d 162, 169-70 (1997). As a result, the trial court did not err by excluding evidence concerning the statements that Eric Bryant made to Ms. Moultrie.

### c. Ms. Moultrie's Suppression Motion

Thirdly, Defendant contends that the trial court erred by failing to allow the admission of evidence concerning statements contained in affidavits submitted in support of Ms. Moultrie's motion to suppress statements made during an interview conducted by investigating officers for the purpose of impeaching her testimony. More specifically, Defendant contends that the

information contained in these affidavits, which were executed by Ms. Moultrie's defense counsel, was admissible for the purpose of challenging the credibility of her trial testimony, which was consistent with the statements made during this interview. We do not find Defendant's contention persuasive.

After being charged with involvement in Mr. Bradshaw's murder, Ms. Moultrie moved to suppress her statement to investigating officers on the grounds that her statement had resulted from unlawful police coercion. Ms. Moultrie's suppression motions, which were accompanied by affidavits executed by her trial counsel on the basis of information and belief, asserted that Ms. Moultrie had been threatened, intimidated, subjected to sleep deprivation, deprived of the ability to communicate with family members, and told that she would go to jail in the event that she did not make a statement. After the State introduced evidence concerning the statements that Ms. Moultrie made during this interview at Defendant's trial for corroborative purposes, Defendant unsuccessfully sought to cross-examine Ms. Moultrie about the statements concerning the circumstances surrounding the making of her original statement contained in her suppression motions and supporting affidavits. In his brief, Defendant contends that, since these statements were made in documents signed and filed

by her authorized agents, he was entitled to use them for the purpose of attacking the credibility of her trial testimony.

A careful review of the appellate decisions relating to this issue establishes that the trial court's ruling was consistent with the Supreme Court's decision in *State v. Gell*, 351 N.C. 192, 524 S.E.2d 332, *cert. denied*, 531 U.S. 867, 121 S. Ct. 163, 148 L. Ed. 2d 110 (2000). In *Gell*, the defendant sought to question two witnesses concerning allegations made in connection with the litigation of suppression motions in which the witnesses alleged that certain inculpatory statements that they had previously made to investigating officers had been obtained by coercion. *Id.* at 208, 524 S.E.2d at 343. In rejecting this contention, the Supreme Court held that the "motions to suppress and supporting affidavits were inadmissible hearsay," that the "trial court correctly prohibited defendant from questioning [the witnesses] regarding the specific documents filed on their behalf in their individual cases," and that "defendant was not prevented from impeaching the witnesses by questioning them about the voluntariness of their statements." *Id.* at 209, 524 S.E.2d at 343. Although Defendant attempts to distinguish *Gell* on the basis of a contention that the Court's holding conflicted with decisions made in prior cases, we believe that the decisions upon which Defendant relies

are factually distinguishable from *Gell*. In addition, even if a conflict of the type that Defendant posits actually exists, we are bound by the most recent authority from the Supreme Court relevant to any particular issue, which Defendant, in this instance, appears to concede to be *Gell*. *State v. Whitaker*, 201 N.C. App. 190, 201-02, 689 S.E.2d 395, 402 (2009) (holding that "we do not have authority to overrule decisions of the Supreme Court"), *aff'd*, 364 N.C. 404, 700 S.E.2d 215 (2010). As a result, the trial court did not err by precluding Defendant from cross-examining Ms. Moultrie concerning the contents of the suppression motion and supporting affidavits that were signed and filed by her trial counsel.

## B. *In Camera* Review

Next, Defendant has requested that this Court review certain documents that the trial court declined, after an *in camera* review, to order be provided to Defendant for the purpose of ascertaining if they contained exculpatory information that should have been disclosed to Defendant prior to trial. We conduct such reviews on a *de novo* basis, *State v. Tadeja*, 191 N.C. App. 439, 449, 664 S.E.2d 402, 410 (2008), with our practice being to "examine the sealed records to determine if they contain information that is 'both favorable to the accused and material [to either] his guilt or punishment.'" *State v.*

*McGill*, 141 N.C. App. 98, 101-02, 539 S.E.2d 351, 355 (2000) (alteration in original) (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 57, 107 S. Ct. 989, 1001, 94 L. Ed. 2d 40, 57 (1987)). After carefully reviewing the sealed information, we conclude that the trial court did not err by refusing to order that any of the information contained in the documents in question be disclosed to Defendant prior to trial.

## C. Motion for Appropriate Relief

On 25 March 2014, Defendant filed a motion for appropriate relief with this Court pursuant to N.C. Gen. Stat. § 15A-1418(a). In his motion, Defendant alleges that the State unlawfully failed to inform him of the existence of evidence that he believes to have been in its possession at the time of or prior to trial and requests that we either vacate his convictions or remand this case to the trial court for an evidentiary hearing. After carefully reviewing Defendant's motion and the attached supporting materials, we conclude that Defendant's motion for appropriate relief should be denied.

As we have already noted, Defendant presented evidence tending to suggest that individuals other than Defendant murdered Mr. Bradshaw. For example, Defendant elicited evidence tending to show that Mr. Brown was seen after Mr. Bradshaw's death in a disheveled condition with blood on one of

his socks. Similarly, Defendant elicited evidence tending to show that Mr. Taylor and Ms. Kelly were seen in possession of Mr. Bradshaw's automobile on a number of occasions after the murder. In response to this second defense contention, investigating officers interviewed Mr. Taylor, who led them to a second blue Mustang that was similar to the one that Mr. Bradshaw had owned. More specifically, Mr. Bradshaw owned a 2007 Mustang with a black convertible top while the other vehicle was a 2008 Mustang with a beige convertible top.[4]

In rebuttal, Mr. Taylor testified that, despite having lived in Longwood for his entire life, he had never seen Mr. Bradshaw or Mr. Bradshaw's vehicle. According to Mr. Taylor, Aleisha Faircloth owned the blue Mustang with a cream-colored top. Mr. Taylor had been in the back of Ms. Faircloth's Mustang while it had been parked in his driveway on one or more occasions.

Subsequently, Defendant sought to determine how the investigating officers could have known that Ms. Faircloth's vehicle was a 2008, rather than a 2007, model. As the result of a title and vehicle history information search performed by a defense investigator, Defendant located documentation tending to suggest that the certificate of origin associated with Ms.

---

[4]Photographs of the 2008 blue Mustang were admitted into evidence as State's Exhibit Nos. 193 and 194.

Faircloth's vehicle had been issued in Dearborn, Michigan, on 25 April 2008; that the vehicle had been assigned to a dealership in Oklahoma City, Oklahoma, at that time; that the vehicle had been purchased by a rental car dealership in Charlotte on 29 April 2008; that the vehicle had been transferred to Ford Motor Credit on 10 December 2008; that the vehicle had been transferred to Quality Motor in Whiteville on 23 December 2008; and that the vehicle was purchased by a couple residing in Ash on 23 December 2008. Based upon this evidence, Defendant contends that, since Ms. Faircloth's Mustang could not have been in Brunswick County during the time in which the murder occurred, the State was or should have been aware of this fact; and that he is entitled to relief from his convictions based upon the State's failure to disclose this evidence.

### 1. Statutory Grounds for Relief

As an initial matter, Defendant directs our attention to N.C. Gen. Stat. § 15A-903(a)(1), which requires the State, upon request, to "make available to the defendant the complete files of all law enforcement agencies, investigatory agencies, and prosecutors' offices involved in the investigation of the crimes committed or the prosecution of the defendant," and N.C. Gen. Stat. § 15A-907, which makes this disclosure obligation a continuing one. However, statutory violations such as those

alleged to have occurred in this instance are not cognizable in a motion for appropriate relief made more than ten days after the entry of judgment. N.C. Gen. Stat. § 15A-1415(b). As a result, given that Defendant's motion for appropriate relief was filed more than ten days after the entry of judgment, he is not entitled to relief from his convictions on the basis of alleged violations of N.C. Gen. Stat. §§ 15A-903(a)(1) and 15A-907.

## 2. Presentation of False Evidence

Secondly, Defendant contends that the State's conduct amounted to the knowing presentation of misleading testimony in violation of his federal and state constitutional right to due process. Assuming, without deciding, that the non-disclosure of the evidence described in Defendant's motion for appropriate relief constituted the knowing use of false evidence, we do not believe that Defendant is entitled to relief from his convictions on the basis of this contention.

In *Napue v. Illinois*, 360 U.S. 264, 265, 79 S. Ct. 1173, 1175, 3 L. Ed. 2d 1217, 1219 (1959), the United States Supreme Court addressed the issue of whether "the failure of the prosecutor to correct the testimony of the witness which he knew to be false denied petitioner due process of law in violation of the Fourteenth Amendment to the Constitution of the United States" and held that "a conviction obtained through use of

false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment" regardless of whether the false evidence which the State knowingly presented was relevant to the issue of the defendant's guilt or "the credibility of the witness." *Id.* at 269, 79 S. Ct. at 1177, 3 L. Ed. 2d at 1221. Similarly, this Court has held that the "[k]nowing use by the prosecution of materially false testimony violates a defendant's right to a fair trial."[5] *State v. Morgan*, 60 N.C. App. 614, 622, 299 S.E.2d 823, 828 (1983).

"The United States Supreme Court has established the standard of materiality under which the knowing use of perjured testimony requires a conviction to be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *State v. Call*, 349 N.C. 382, 405, 508 S.E.2d 496, 511 (1998) (quotation marks omitted) (quoting S*tate v. Sanders*, 327 N.C. 319, 336, 395 S.E.2d 412, 424 (1990)).

In attempting to persuade us that the allegedly false evidence that the State presented at trial was material, Defendant argues that the evidence in question "deprived

_____

[5]In his motion for appropriate relief, Defendant does not appear to allege that the State made knowing use of false evidence. Instead, Defendant simply argues that he was "deprived of his right to due process of law by the false impression created at his trial." *Morgan*, 60 N.C. App. at 623, 299 S.E.2d at 829.

[Defendant] of a strong jury argument that its witnesses saw exactly what they believed they had seen – Adam Bradshaw's Mustang in Longwood, after the murder, under the control of persons unrelated to the defendant." We do not find Defendant's argument persuasive for a number of reasons.

As an initial matter, the State's case against Defendant was a strong one. Among other things, the State elicited evidence tending to show that Defendant, unlike either Mr. Taylor or Mr. Brown, had a strong motive for wanting to kill Mr. Bradshaw. In addition, Ms. Moultrie testified that Defendant had made statements about wanting to kill Mr. Bradshaw, had had her arrange a meeting between himself and Mr. Bradshaw on the evening on which Mr. Bradshaw was killed, and claimed to have been involved in killing Mr. Bradshaw after the murder. A number of witnesses without any apparent motive to testify falsely stated that Defendant had been dropped off at the location at which the meeting with Mr. Bradshaw was supposed to occur, that Mr. Bradshaw had an appointment at the same time and location specified in Ms. Moultrie's testimony, and that Mr. Bradshaw went to the location at which the meeting was scheduled to occur at the time at which Defendant was shown to have been present. In addition, the record evidence reflects that Mr. Bradshaw was killed at the location at which he was supposed to

meet Defendant, that Defendant's DNA was present in the vicinity of the location at which Mr. Bradshaw was killed, that Mr. Bradshaw's body was disposed of in the manner described in his admission to Ms. Moultrie, and that Defendant owned a weapon that was capable of inflicting the wounds that caused Mr. Bradshaw's death. As a result, the State's case against Defendant was a strong one.

In addition, the fact that Mr. Taylor was seen driving Mr. Bradshaw's vehicle after the murder does not tend to exculpate Defendant. The record is devoid of any evidence tending to show how Mr. Taylor might have obtained possession of Mr. Bradshaw's car. In addition, the record contains evidence that Defendant might not have been alone at the time that Mr. Bradshaw was murdered. As a result, the record does not establish that any involvement in Mr. Bradshaw's murder that Mr. Taylor might have had was exclusive of Defendant's involvement in the commission of that crime.

Finally, Mr. Taylor did not indicate a specific time in which he rode in Ms. Faircloth's Mustang. Although the evidence offered on Defendant's behalf tended to show that Mr. Taylor was seen riding in Mr. Bradshaw's vehicle after the date upon which the murder occurred, the same cannot be said of Mr. Taylor's claim to have ridden in Ms. Faircloth's Mustang. As a result,

any testimony by Mr. Taylor to the effect that he rode in Ms. Faircloth's vehicle did little to rebut Defendant's claim that he had been seen in Mr. Bradshaw's vehicle after his death. As a result, Mr. Taylor's rebuttal testimony was not as conclusive as Defendant tends to suggest.

As a general proposition, reviewing courts have found the materiality necessary to support an award of relief in instances in which the defendant's conviction was based upon the testimony of the witness who provided the knowingly false evidence. *See* *Napue*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217; *Mooney v. Holohan*, 294 U.S. 103, 55 S. Ct. 340, 79 L. Ed. 791 (1935); *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972); *Morgan*, 60 N.C. App. 614, 299 S.E.2d 823. In each of those cases, the State's case against the defendant hinged on the testimony of a witness whose credibility could not be fully evaluated given the prosecution's failure to fully disclose reasons for questioning the witness' veracity. In this case, on the other hand, the undisclosed evidence related to the credibility of a witness whose testimony did not have such a direct bearing on the issue of Defendant's guilt. As a result, given that we are unable to determine that "there is any reasonable likelihood that the [purportedly] false testimony could have affected the judgment of the jury," *Call*, 349 N.C. at

405, 508 S.E.2d at 511, we conclude that the *Napue* claim set out in Defendant's motion for appropriate relief lacks merit.

### 3. *Brady* Claim

Finally, Defendant asserts that the State violated his due process rights by failing to disclose the existence of evidence tending to show that Ms. Faircloth's car was not in North Carolina at the time of Mr. Bradshaw's murder. Once again, we conclude that Defendant is not entitled to relief based on this claim.

As the Supreme Court held in *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97, 10 L. Ed. 2d 215, 218 (1963), "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." However, "the United States Supreme Court [has] rejected the idea that every nondisclosure automatically constitutes reversible error and held that 'prejudicial error must be determined by examining the materiality of the evidence.'" *State v. Tirado*, 358 N.C. 551, 589, 599 S.E.2d 515, 540 (2004) (quoting *State v. Howard*, 334 N.C. 602, 605, 433 S.E.2d 742, 744 (1993)), *cert. denied*, 544 U.S. 909, 125 S. Ct. 1600, 161 L. Ed. 2d 285 (2005). "'The evidence is material only if there is a reasonable probability

that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.'" *Id.* at 589, 599 S.E.2d at 540-41 (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383, 87 L. Ed. 2d 481, 494 (1985)). Assuming, without deciding, that the State failed to disclose the information upon which Defendant's claim relies, we are unable to conclude that the undisclosed evidence satisfies *Brady*'s materiality requirement.

As we have previously indicated, Defendant contends that his ability to present an effective defense was hampered by the State's suggestion on rebuttal that Mr. Taylor was driving Ms. Faircloth's Mustang, rather than Mr. Bradshaw's Mustang, immediately after Mr. Bradshaw's death. In view of the fact that the State's case against Defendant was a strong one, the fact that Mr. Taylor was seen in possession of Mr. Bradshaw's vehicle after the date of the murder does not tend to exculpate Defendant, and the fact that Mr. Taylor never testified that he had been a passenger in Ms. Faircloth's vehicle around the time of Mr. Bradshaw's death, his testimony did little, if anything, to rebut Defendant's evidence. As a result, given that the undisclosed evidence does little to undermine our confidence in

the outcome reached at Defendant's trial, we conclude that Defendant has failed to establish the materiality of the undisclosed evidence. As a result, Defendant's motion for appropriate relief should be, and hereby is, denied.[6]

## III. Conclusion

Thus, for the reasons set forth above, we conclude that none of Defendant's challenges to the trial court's judgments have merit and that Defendant's motion for appropriate relief should be denied. As a result, the trial court's judgments should, and hereby do, remain undisturbed.

NO ERROR.

Judge ROBERT N. HUNTER, Jr., concurred in this opinion prior to 6 September 2014.

Judge DAVIS concurs.

Report per Rule 30(e).

---

[6]According to N.C. Gen. Stat. § 15A-1418(b), "[w]hen a motion for appropriate relief is made in the appellate division, the appellate court must decide whether the motion may be determined on the basis of the materials before it, [or] whether it is necessary to remand the case to the trial division for taking evidence or conducting other proceedings . . .. If the appellate court does not remand the case for proceedings on the motion, it may determine the motion in conjunction with the appeal and enter its ruling on the motion with its determination of the case." As a result of our belief that we do not need to have additional factual development in order to decide the issues raised by Defendant's motion for appropriate relief on materiality grounds, we believe that we are in a position to address the issues raised by Defendant's motion for appropriate relief on the merits without the necessity for conducting further proceedings.